# UNITED STATES *v.* NAFTALIN

No. 78–561.   Argued March 26, 1979—Decided May 21, 1979

BRENNAN, J., delivered the opinion of the Court, in which all other Members joined except POWELL, J., who took no part in the consideration or decision of the case.

*Stephen M. Shapiro* argued the cause for the United States. With him on the briefs were *Solicitor General McCree, Assist-*

*ant* Attorney General Heymann, *Robert J. Erickson,* and *David Ferber.*

*Joe A. Walters* argued the cause and filed a brief for respondent.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question presented in this case is whether § 17 (a)(1) of the Securities Act of 1933, 48 Stat. 84, as amended, 68 Stat. 686, 15 U. S. C. § 77q (a)(1), prohibits frauds against brokers as well as investors. We hold that it does.

Respondent, Neil Naftalin, was the president of a registered broker-dealer firm and a professional investor. Between July and August 1969, Naftalin engaged in a "short selling" scheme. He selected stocks that, in his judgment, had peaked in price and were entering into a period of market decline. He then placed with five brokers orders to sell shares of these stocks, although he did not own the shares he purported to sell. Gambling that the price of the securities would decline substantially before he was required to deliver them, respondent planned to make offsetting purchases through other brokers at lower prices. He intended to take as profit the difference between the price at which he sold and the price at which he covered. Respondent was aware, however, that had the brokers who executed his sell orders known that he did not own the securities, they either would not have accepted the orders, or would have required a margin deposit. He therefore falsely represented that he owned the shares he directed them to sell.[1]

Unfortunately for respondent, the market prices of the securities he "sold" did not fall prior to the delivery date, but instead rose sharply. He was unable to make covering pur-

---

[1] A broker may mark an order to sell a customer's shares "long" if he "is informed that the seller owns the security ordered to be sold and, as soon as possible without undue inconvenience or expense, will deliver the security . . . ." 17 CFR § 240.10a–1 (d) (1978).

chases, and never delivered the promised securities. Consequently, the five brokers were unable to deliver the stock which they had "sold" to investors, and were forced to borrow stock to keep their delivery promises. Then, in order to return the borrowed stock, the brokers had to purchase replacement shares on the open market at the now higher prices, a process known as "buying in."[2] While the investors to whom the stocks were sold were thereby shielded from direct injury, the five brokers suffered substantial financial losses.

The United States District Court for the District of Minnesota found respondent guilty on eight counts of employing "a scheme and artifice to defraud" in the sale of securities, in violation of § 17 (a)(1).[3] App. 24–25; App. to Pet. for Cert. 15a–20a. Although the Court of Appeals for the Eighth Circuit found the evidence sufficient to establish that respondent had committed fraud, 579 F. 2d 444, 447 (1978), it nonetheless vacated his convictions. Finding that the purpose of the Securities Act "was to protect investors from fraudulent practices in the sale of securities," *ibid.*, the court held that "the government must prove some impact of the scheme on an investor," *id.*, at 448. Since respondent's fraud injured only brokers and not investors, the Court of Appeals concluded that Naftalin did not violate § 17 (a)(1). We granted certiorari, 439 U. S. 1045 (1978), and now reverse.

## I

Section 17 (a) of the Securities Act of 1933, subsection (1) of which respondent was found to have violated, states:

---

[2] If a broker executes a sell order marked "long" and the seller fails to deliver the securities when due, under certain circumstances the broker must "buy in" substitute securities. See 17 CFR § 240.10a–2 (a) (1978). See also 2 L. Loss, Securities Regulation 1233–1235 (2d ed. 1961) (hereinafter Loss).

[3] Willful violations of § 17 (a) are made subject to criminal sanctions by § 24 of the Securities Act, 15 U. S. C. § 77x.

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

In this Court, Naftalin does not dispute that, by falsely representing that he owned the stock he sold, he defrauded the brokers who executed his sales. Brief for Respondent 7–8, 11; Tr. of Oral Arg. 17–18. He contends, however, that the Court of Appeals correctly held that § 17 (a) (1) applies solely to frauds directed against investors, and not to those against brokers.

Nothing on the face of the statute supports this reading of it. Subsection (1) makes it unlawful for "any person in the offer or sale of any securities . . . *directly or indirectly* . . . to employ *any* device, scheme, or artifice to defraud . . . ." (Emphasis added.) The statutory language does not require that the victim of the fraud be an investor—only that the fraud occur "in" an offer or sale.

An offer and sale clearly occurred here. Respondent placed sell orders with the brokers; the brokers, acting as agents, executed the orders; and the results were contracts of sale, which are within the statutory definition, 15 U. S. C. § 77b (3).

Moreover, the fraud occurred "in" the "offer" and "sale." [4] The statutory terms, which Congress expressly intended to define broadly, see H. R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933); 1 Loss 512 n. 163; cf. *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 467 n. 8 (1969), are expansive enough to encompass the entire selling process, including the seller/agent transaction. Section 2 (3) of the Act, 48 Stat. 74, as amended, 68 Stat. 683, 15 U. S. C. § 77b (3), states:

> "The term 'sale' . . . shall include every contract of sale or disposition of a security or interest in a security, for value. The term . . . 'offer' shall include *every attempt* or offer *to dispose of . . . a security* or interest in a security, for value." (Emphasis added.)

This language does not require that the fraud occur in any particular phase of the selling transaction. At the very least, an order to a broker to sell securities is certainly an "attempt to dispose" of them.

Thus, nothing in subsection (1) of § 17 (a) creates a requirement that injury occur to a purchaser. Respondent nonetheless urges that the phrase, "upon the purchaser," found only in subsection (3) of § 17 (a), should be read into all three subsections. The short answer is that Congress did not write the statute that way. Indeed, the fact that it did not provides strong affirmative evidence that while impact upon a purchaser may be relevant to prosecutions brought

---

[4] Respondent contends that the requirement that the fraud be "in" the offer or sale connotes a narrower range of activities than does the phrase "in connection with," which is found in § 10 (b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78j (b). First, we are not necessarily persuaded that "in" is narrower than "in connection with." Both Congress, see H. R. Rep. No. 85, 73d Cong., 1st Sess., 6 (1933), and this Court, see *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U. S. 6, 10 (1971), have on occasion used the terms interchangeably. But even if "in" were meant to connote a narrower group of transactions than "in connection with," there is nothing to indicate that "in" is narrower in the sense insisted upon by Naftalin.

under § 17 (a)(3), it is not required for those brought under § 17 (a)(1). As is indicated by the use of an infinitive to introduce each of the three subsections, and the use of the conjunction "or" at the end of the first two, each subsection proscribes a distinct category of misconduct.[5] Each succeeding prohibition is meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections. See *United States* v. *Birrell,* 266 F. Supp. 539, 542–543 (SDNY 1967). There is, therefore, "no warrant for narrowing alternative provisions which the legislature has adopted with the purpose of affording added safeguards." *United States* v. *Gilliland,* 312 U. S. 86, 93 (1941).[6]

## II

The court below placed primary reliance for its restrictive interpretation of § 17 (a)(1) upon what it perceived to be Congress' purpose in passing the Securities Act. Noting that both this Court and Congress have emphasized the importance of the statute in protecting investors from fraudulent practices in the sale of securities, see *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 195 (1976), the Court of Appeals concluded that "against this backdrop . . . we are constrained to hold that

---

[5] Moreover, while matters like "punctuation [are] not decisive of the construction of a statute," *Costanzo* v. *Tillinghast,* 287 U. S. 341, 344 (1932), where they reaffirm conclusions drawn from the words themselves they provide useful confirmation. Here the use of separate numbers to introduce each subsection, and the fact that the phrase "upon the purchaser" was set off solely as part of subsection (3), confirm our conclusion that "[n]othing on the face of the statute suggests a congressional intent to limit its coverage," *United States* v. *Culbert,* 435 U. S. 371, 373 (1978), to frauds against purchasers.

[6] This case involves a criminal prosecution. The decision in *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723 (1975), which limited to purchasers or sellers the class of plaintiffs who may have private implied causes of action under Securities and Exchange Commission Rule 10b–5, is therefore inapplicable. See *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 467 n. 9 (1969).

the government must prove some impact of the scheme on an investor." 579 F. 2d, at 448.

But neither this Court nor Congress has ever suggested that investor protection was the *sole* purpose of the Securities Act. As we have noted heretofore, the Act "emerged as part of the aftermath of the market crash in 1929." *Ernst & Ernst* v. *Hochfelder, supra,* at 194. See generally 1 Loss 120–121. Indeed, Congress' primary contemplation was that regulation of the securities markets might help set the economy on the road to recovery. See 77 Cong. Rec. 2925 (1933) (remarks of Rep. Kelly); *id.,* at 2935 (remarks of Rep. Chapman); *id.,* at 3232 (remarks of Sen. Norbeck); H. R. Rep. No. 85, 73d Cong., 1st Sess., 2 (1933). Prevention of frauds against investors was surely a key part of that program, but so was the effort "to achieve a high standard of business ethics . . . *in every facet of the securities industry." SEC* v. *Capital Gains Bureau,* 375 U. S. 180, 186–187 (1963) (emphasis added). See *Ernst & Ernst* v. *Hochfelder, supra,* at 195; *United States* v. *Brown,* 555 F. 2d 336, 338–339 (CA2 1977).

This conclusion is amply supported by reference to the legislative record. The breadth of Congress' purpose is most clearly demonstrated by the Senate Report:

"The purpose of this bill is to protect the investing public and honest business. . . . The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion; to restore the confidence of the prospective investor in his ability to select sound securities; to bring into productive channels of industry and development capital which has grown timid to the point of hoarding; and to aid in providing employment and

restoring buying and consuming power." S. Rep. No. 47, 73d Cong., 1st Sess., 1 (1933).

While investor protection was a constant preoccupation of the legislators, the record is also replete with references to the desire to protect ethical businessmen. See 77 Cong. Rec. 2925 (1933) (remarks of Rep. Kelly); *id.*, at 2983 (remarks of Sen. Fletcher); *id.*, at 3232 (remarks of Sen. Norbeck); S. Rep. No. 47, 73d Cong., 1st Ses., 1 (1933). As Representative Chapman stated, "[t]his legislation is designed to protect not only the investing public but at the same time to protect honest corporate business." 77 Cong. Rec. 2935 (1933). Respondent's assertion that Congress' concern was limited to investors is thus manifestly inconsistent with the legislative history.

Moreover, the welfare of investors and financial intermediaries are inextricably linked—frauds perpetrated upon either business or investors can redound to the detriment of the other and to the economy as a whole. See generally Securities and Exchange Commission, Report of the Special Study of the Securities Markets, H. R. Doc. No. 95, 88th Cong., 1st Sess., pt. 1, pp. 9–11 (1963). Fraudulent short sales are no exception.[7] Although investors suffered no immediate financial injury in this case because the brokers covered the sales by borrowing and then "buying in," the indirect impact upon investors may be substantial. "Buying in" is in actuality only a form of insurance for investors and, like all forms of insurance, has its own costs. Losses suffered by brokers increase their cost of doing business, and in the long run investors pay at least part of this cost through higher brokerage fees. In addition, unchecked short-sale frauds against brokers would create a level of market uncertainty that could only work to the detriment of both investors and the market as a whole. Finally, while the investors here were shielded from direct injury, that may

---

[7] It bears repeating that respondent was not convicted for short selling, but for *fraudulent* short selling.

not always be the case. Had the brokers been insolvent or unable to borrow, the investors might well have failed to receive their promised shares. Entitled to receive shares at one price under the purchase agreement, they would have had to buy substitute shares in the market at a higher price.[8] Placing brokers outside the aegis of § 17 (a) would create a loophole in the statute that Congress simply did not intend to create.

## III

Although the question was not directly presented in the Government's petition for certiorari, respondent asserts a final, independent argument in support of the judgment below. That assertion is that the Securities Act of 1933 was "preoccupied with" the regulation of initial public offerings of securities, and that Congress waited until the Securities Exchange Act of 1934 to regulate abuses in the trading of securities in the "aftermarket." As Naftalin's fraud did not involve a new offering, he contends that § 17 (a) is inapplicable, and that he should have been prosecuted for violations of either the specific short-selling regulations promulgated under the 1934 Act,[9] or for violations of the general antifraud proscriptions of the 1934 Act's § 10b, 15 U. S. C. § 78j (b), and the SEC's Rule 10b–5, 17 CFR § 240.10b–5 (1978). Tr. of Oral Arg. 17–18; Brief for Respondent 16–17, 22–24.

Although it is true that the 1933 Act was primarily con-

---

[8] Although this potential for immediate financial injury to investors has been reduced by the "buy in" regulations, see 17 CFR § 240.10a–2 (1978), as well as by the provisions of the Securities Investor Protection Act of 1970, see 15 U. S. C. § 78aaa *et seq.*, the potential for indirect injury, described *supra,* still remains. Moreover, these legal requirements did not exist when the 1933 Act was passed, and hence at that time the kind of fraud practiced by respondent might well have caused investors direct financial injury. The subsequent enactments do not serve to restrict the original scope of § 17 (a).

[9] See 15 U. S. C. §§ 78g, 78j (a); 12 CFR §§ 220.3, 220.4 (c) (ii), 220.8 (d), 224.2 (1978); 17 CFR § 240.10a–1 (1978).

cerned with the regulation of new offerings, respondent's argument fails because the antifraud prohibition of § 17 (a) was meant as a major departure from that limitation. Unlike much of the rest of the Act, it was intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading. 1 Loss 130; Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L. J. 171, 182 (1933); V. Brudney & M. Chirelstein, Corporate Finance 740 (1972). This is made abundantly clear both by the statutory language, which makes no distinctions between the two kinds of transactions, and by the Senate Report, which stated:

> "The act subjects the sale of old or outstanding securities to the same criminal penalties and injunctive authority for fraud, deception, or misrepresentation as in the case of new issues put out after the approval of the act. In other words, fraud or deception in the sale of securities may be prosecuted regardless of whether the security is old or new, or whether or not it is of the class of securities exempted under sections 11 or 12." S. Rep. No. 47, 73d Cong., 1st Sess., 4 (1933).

Accord, H. R. Rep. No. 85, 73d Cong., 1st Sess., 6 (1933). Respondent is undoubtedly correct that the two Acts prohibit some of the same conduct. See 3 Loss 1428. But "[t]he fact that there may well be some overlap is neither unusual nor unfortunate." *SEC* v. *National Securities, Inc.,* 393 U. S., at 468. See *Edwards* v. *United States,* 312 U. S. 473, 484 (1941). It certainly does not absolve Naftalin of guilt for the transactions which violated the statute under which he was convicted.

## IV

This is a criminal case, and we have long held that " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity,' " *United States* v. *Culbert,* 435 U. S. 371, 379 (1978), quoting *Rewis* v. *United States,* 401

U. S. 808, 812 (1971), and that a defendant may not " 'be subjected to a penalty unless the words of the statute plainly impose it,' " *United States* v. *Campos-Serrano,* 404 U. S. 293, 297 (1971), quoting *Keppel* v. *Tiffin Savings Bank,* 197 U. S. 356, 362 (1905). In this case, however, the words of the statute do "plainly impose it." Here, "Congress has conveyed its purpose clearly, and we decline to manufacture ambiguity where none exists," *United States* v. *Culbert, supra,* at 379. The decision of the Court of Appeals for the Eighth Circuit is

*Reversed.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.