Victor VERACE, Plaintiff,

v.

NEW YORK STOCK EXCHANGE, INC., et al., Defendants.

No. 76 Civ. 613 (RWS).

United States District Court,
S. D. New York.

Oct. 13, 1979.

Peter J. Byrnes, Mineola, N. Y., for plaintiff.

Milbank, Tweed, Hadley & McCloy, New York City, for defendants; Russell E. Brooks, Toni C. Lichstein, Paul T. Shoemaker, New York City, of counsel.

## OPINION

SWEET, District Judge.

This motion for summary judgment brought by defendant New York Stock Exchange ("NYSE") arises from an action by plaintiff Victor Verace ("Verace") to recover the value of securities deposited with defendant Orvis Brothers and Company ("Orvis") pursuant to a subordinated lending agreement. Plaintiff has cross-moved for summary judgment against the NYSE pursuant to Fed.R.Civ.P. 56.

The relevant events commenced ten years ago in late 1969, when the NYSE, a national securities exchange registered pursuant to section 6 of the Exchange Act, 15 U.S.C. § 78f, discovered that Orvis, one of its small member firms was operating in violation of the NYSE's net capital rule,[1] its segregation rule and others. On February 4, 1970, representatives of the NYSE met with rep-

---

1. The net capital rule is designed to ensure the financial stability of exchange members by establishing the extent to which a member's aggregate indebtedness may exceed its net capital. *See* NYSE Rule 325.

resentatives of Orvis, and prepared a memorandum reflecting a net capital deficiency of more than $383,000 and listing Verace as a prospect for new capital.

On approximately February 3, 1970, Verace, a sophisticated investor[2] who was then a subordinated lender to another member firm, deposited $100,000 worth of securities with Orvis. On February 11, 1970, Verace signed a subordination agreement with Orvis which provided that the agreement would be effective on the date it was approved by the NYSE. An application for such approval was not submitted to the NYSE because Verace initially assumed that his previous application and approval as a subordinated lender to another firm obviated the need for an additional application. Orvis was informed on May 4, 1970 that a new application would be necessary.

During that period of time Verace received the six percent interest provided by the agreement. On April 21, 1970, he initialled a modification of the subordinated lending agreement replacing the provision stating that the securities could not be withdrawn until after May 11, 1970, with a provision barring withdrawals until "ninety days after demand." This change was implemented by Orvis, although it was done at the request of the NYSE to make the agreement consistent with the Exchange's rules.

By letter to Orvis dated May 14, 1970, Verace terminated his subordinated lending status. On June 25, 1970, Verace received a telegram from a representative of Orvis stating that all securities held in the accounts of all subordinated lenders would be sold to provide funds for the orderly liquidation of Orvis. By telegram dated June 26, 1970, Verace advised Orvis to take no action with respect to his securities because he was not a subordinated lender. On June 29, the NYSE directed Orvis to liquidate all proprietary positions and on July 1, 1970, Fred Stock of the NYSE told representatives of Orvis that the loan made by Verace was "good capital,"[3] even though he had been informed that Verace had not submitted an application to the NYSE for its approval of his status as a subordinated lender of Orvis.[4] An attempt by Verace to have the state court enjoin the liquidation of his securities proved unsuccessful.

Verace makes two basic claims against the NYSE. First, he alleges that the defendant violated sections 6 and 10 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78f, 78j, by failing to enforce properly the constitution, rules and regulations of the Exchange. In particular, he claims that the NYSE knew or should have known of the irregularities in the conduct of Orvis's business and of its alleged violations of the NYSE's rules, but that it failed to investigate and to take action against Orvis as it should have.[5] As a result, Verace alleges

2. Plaintiff pursued a career in the securities industry for over fifty years, during which time he held a variety of positions including registered representative, back office manager and part owner of a brokerage firm, member of the Exchange and Governor of the Curb Exchange (the predecessor to the American Stock Exchange).

3. By the classification of the securities as "good capital," Stock apparently meant that they could be considered in computing Orvis's net capital under NYSE Rule 325 and that they were subject to treatment as a subordinated loan.

4. A memorandum dated July 7, 1970 from John Videtti, the NYSE's Senior Financial Specialist, details the background of the Verace subordination agreement with Orvis. It indicates that on May 11, 1970, the NYSE's Finance department sent a memorandum to the Secretary's office stating that Verace "was OK to post as sub lender." It also reveals that Orvis was not sent a letter regarding acceptance of the agreement and asks "can we say agreement was approved by Exch."?

5. Verace's primary allegation appears to be that the NYSE failed to enforce its net capital rule. NYSE Rule 325. He also claims for the first time in this three-year-old lawsuit, that the NYSE did not comply with Article 13 of the Constitution of the Exchange, which provides in pertinent part:

Whenever it shall appear to the Chairman of the Board that a member firm or member corporation has failed to meet its engagements, or is insolvent, or the Chairman of the Board has been advised by the Board of Governors or by the Board of Directors of Stock

that he loaned the securities to Orvis, but never recovered his assets in liquidation.

In his second claim, Verace alleges that the NYSE violated section 10b of the Exchange Act and rule 10b–5 thereunder by failing to disclose Orvis's financial condition and by concealing it from the plaintiff. He further claims that the NYSE aided and abetted Orvis in obtaining the modification of the subordination agreement and that it classified the securities as "good capital" so they could be used during Orvis's liquidation.

## A. Failure to Enforce Exchange Rules

In 1977, the Second Circuit decided a series of cases relating to the issue of who has a cause of action against a national securities exchange for damages suffered as a result of an exchange's failure to force its members to comply with the exchange's rules. In *Lank v. New York Stock Exchange*, 548 F.2d 61 (2d Cir. 1977), the court held that a receiver for a former member of any exchange, who stood in the shoes of the exchange member, could not sue the exchange under section 6 to recover for such an alleged failure to force compliance. The court concluded that the primary purpose of the Exchange Act was to protect public investors, and found no indication that exchange members were considered to be within the class of public investors that section 6 was designed to protect. *Id.* at 64–65. It further noted that

> [t]heir [public investors'] interests may often be antagonistic to those of exchange members, and it could well have a serious disruptive effect on the securities industry and the national economy itself were we to require an exchange so to enforce its rules as to avoid possible risk

to its own members and their creditors and stockholders in such a way that the interests of the public investors, paramount in the legislative scheme, are disregarded. *Id.* at 66.[6]

For similar reasons, the court shortly thereafter concluded that a subordinated lender of a member firm has no section 6 claim against an exchange for violations of that section. *See Arneil v. Ramsey*, 550 F.2d 774 (2d Cir. 1977); *Murphy v. McDonnell & Co.*, 553 F.2d 292 (2d Cir. 1977). *See also Aldrich v. New York Stock Exchange*, 446 F.Supp. 348 (S.D.N.Y.1977). The court in *Arneil* also indicated that section 6 claims are not available to those who invest in member firms, unless they are purchasers of its publicly traded securities.[7] This line of cases was strengthened by *Hirsch v. duPont*, 553 F.2d 750 (2d Cir. 1977), in which the court refused to allow a limited partner of a member firm to recover under rule 10b–5 solely on the basis of an asserted violation of an exchange's duty of self regulation, where his recovery under section 6 would be precluded by its decision in *Arneil*. *Accord Murphy v. McDonnell & Co.*, 553 F.2d 292, 295–296 (exchange has no duty to disclose under Rule 10b–5 when no such duty exists under section 6). The court reasoned that the holding in *Arneil* was intended to insure the exchange's undivided loyalty to the public investor, and that it would not allow that end to be undermined by an identical claim under rule 10b–5. *Hirsch v. duPont*, supra, at 761.

■ Plaintiff Verace attempts to circumvent the *Arneil* holding by claiming that he was not a subordinated lender to Orvis because he never received approval from the

---

Clearing Corporation that such member firm or member corporation is in such financial or operating condition that it cannot be permitted to continue in business with safety to its creditors or the Exchange, prompt notice thereof shall be given to the Exchange. Such member firm or member corporation shall thereby become suspended as a member firm or as a member corporation and every member or allied member who is a general partner or holder of voting stock therein shall thereby become suspended from membership

or allied membership, until reinstated as provided in Section 5 of this Article.

**6.** An apt example of the type of conflict that can occur may be found in Note, *Exchange Liability Under Section 6 of the Securities Act: The Eligible Plaintiff Problem*, 78 Colum.L.Rev. 112, 122 n.94 (1978).

**7.** The court apparently viewed such persons as the "public investors" for whose protection section 6 was enacted.

NYSE. Even if he did not formally receive approval, the undisputed facts reveal that Verace intended to become a subordinated lender, that he received interest on his loan as provided by the subordination agreement and that the only reason that he did not submit an application to the NYSE to become a subordinated lender was because he did not believe it necessary to do so. Assuming, *arguendo*, that he was not a subordinated lender, his position as an investor in the member firm places him outside the class of public investors for whose purpose section 6 was enacted. *See Arneil v. Ramsey, supra*, at 783. As a lender of capital to Orvis, he undeniably had an interest in the way in which the NYSE enforced its rules, and that interest was at odds with the interests of public investors. Such a conflict is apparent here, where the NYSE's attempt to encourage a solution to Orvis's capital problems may have been in the interest of Orvis's customers, even though immediate suspension may have spared Verace the loss of his securities. *See also Hirsch v. duPont, supra*, at 760–61.

Plaintiff also challenges the continuing vitality of *Lank* and its progeny in light of *United States v. Naftalin*, —— U.S. ——, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979), wherein the Supreme Court applied section 17(a) of the 1933 Act to frauds directed against a member firm. In *Naftalin*, the Court observed that Congress's concern in the passage of the 1933 Act was not "solely" the protection of public investors. *Naftalin* is not controlling in this case, however, both because it involved the 1933 Act rather than the Securities Exchange Act of 1934 and because the Court specifically distinguished this case, which involved a criminal prosecution, from cases implying a private right of action in the civil context. *United States v. Naftalin*, 441 U.S. 768, 774 n.6, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979).

In addition, the Court also held last term that there is no implied private right of

action under section 17(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q(a), because the section does not, by its terms, create a private cause of action and it neither prohibits certain conduct nor creates federal rights in favor of private parties. *Touche Ross & Co. v. Redington*, —— U.S. ——, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Section 17(a) simply requires national securities exchanges, its members and others to keep such records and file such reports as the Securities and Exchange Commission may prescribe in order to ensure compliance with requirements such as the net capital rule. Like section 17(a), section 6 does not, by its terms, create a private right of action, prohibit certain conduct nor create rights in favor of private parties. Moreover, the statement in *Redington* that the mere fact section 17(a) was designed to provide protection for customers did not require the implication of a private right of action on their behalf, *id.* at ——, 99 S.Ct. 2479, raises the possibility that not even public investors have a private right of action under section 6.

### B. *Other Violations of Section 10b*

Verace's second claim against the NYSE is that the defendant concealed Orvis's true financial condition from Verace and permitted Orvis to seek new capital and hold itself out to the public as a member firm in good standing. He also alleges that defendant aided and abetted Orvis in obtaining the extension of the subordination agreement, and that it secured the liquidation of his securities by deeming them to be "good capital."

 Ordinarily, those who, like the defendant, are not parties to any purchase or sale, are not under a duty to disclose unless they are aiders and abettors or have themselves substantially participated in some concealment. *Murphy v. McDonnell & Co., Inc.*, 553 F.2d 292, 295 (2d Cir. 1977).[8] "In

8. In *Murphy v. McDonnell & Co., Inc., supra*, at 296, the court, in finding that the Exchange had no duty to disclose the results of its investigations, relied heavily on the fact that the Exchange had not made an affirmative misrepre-

sentation and that sophisticated lenders had not sought its advice. Verace argues that even if he had sought this information from the NYSE he would not have received it because of its policy not to disclose such information.

either event, knowledge of the fraud, and not merely the undisclosed material facts, is indispensable." *Hirsch v. duPont,* 553 F.2d 750, 759 (2d Cir. 1977).

Verace has not set forth specific facts as required by Fed.R.Civ.P. 56(e) to show that there is a genuine issue as to whether the NYSE knew that Verace, a sophisticated investor, was being misled by Orvis as to its financial situation. Although the NYSE undeniably knew of Orvis's violations of the net capital rule, this does not constitute the type of knowledge necessary to establish a violation of section 10b or rule 10b–5. *Cf. Murphy v. McDonnell & Co., Inc., supra,* at 295 (fact that exchange pressed member to satisfy deficient net capital status by seeking new capital does not create duty to disclose absent knowledge of fraud). Verace's argument that the NYSE must have known of the fraud because it knew that a sophisticated investor would not have invested in an insolvent firm has some superficial appeal. However, the failure of the Exchange to consider the representations that Orvis might have made to induce Verace's investment at most constitutes recklessness, and as the Second Circuit recently indicated in *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478 (2d Cir. 1979), even recklessness does not establish the requisite *scienter* to support an aiding and abetting claim in the absence of a fiduciary relationship with the plaintiff. Rather, something closer to actual intent to aid in a fraud must be shown, *supra,* at 484–85, and in the absence of allegations of facts to support such a finding, summary judgment on the issue of disclosure must be granted for defendant NYSE.

Plaintiff relies on the fact that in January, 1970, Robert Milam, a registered representative of Orvis, was refused information about a prior disciplinary proceeding against that firm. In the absence of allegations that Verace knew about this refusal and that he refrained from seeking information from the NYSE because of it, this court need not address the question of the NYSE's duty to make such disclosures when they are requested. It is noted, however, that if such a duty to disclose were imposed,

 However, Verace's claims that the NYSE aided and abetted Orvis in obtaining the modification of the subordination agreement and that it knowingly and fraudulently classified his securities as "good capital" will survive this motion for summary judgment. The plaintiff has made factual allegations about the motives of the NYSE, and the timing of its actions, which may relate to the issue of *scienter.*

Accordingly, summary judgment will be granted for the defendant NYSE except on these latter claims.

IT IS SO ORDERED.

such disclosures would effectively prevent the member firms from acquiring new capital in an attempt to satisfy temporary violations of the net capital rule. Since the net capital rule was promulgated under section 6 to protect public investors, such a duty might be antithetical to the purpose of the section because it would undermine attempts to stabilize the financial community. *See generally, Murphy v. McDonnell & Co., Inc., supra,* at 295–96.