SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

DRYSDALE SECURITIES
CORPORATION, et al.,
Defendants.

No. 83 Civ. 5599 (RWS).

United States District Court,
S.D. New York.

March 22, 1985.

Ira Lee Sorkin, Regional Administrator, New York City, for plaintiff Securities and Exchange Commission; Daniel L. Goelzer, General Counsel, Jacob H. Stillman, Associate General Counsel, Rosalind C. Cohen, Asst. Regional Administrator, New York City, Jason R. Gettinger, Assistant Regional Administrator, Daniel J. Kraus, Washington, D.C., of counsel.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendants Warren Essner; Peter Fleming, Jr., Mark H. O'Donoghue, Bernard V. Preziosi, Jr., New York City, of counsel.

### OPINION

SWEET, District Judge.

Defendant Warren Essner ("Essner") has brought this motion to dismiss the complaint of the plaintiff Securities and Exchange Commission ("SEC") pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) relying upon the Second Circuit's recent decision in *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). The motion is granted.

**The Complaint**

The SEC brought this action against Essner arising out of his participation in a fraud which resulted in the collapse of Drysdale Government Securities, Inc. ("DGSI"), and losses to investors of about $290 million. The allegations in the complaint, described below, are accepted as true for the purposes of deciding this motion to dismiss. *Miree v. DeKalb*, 433 U.S. 25, 27, 97 S.Ct. 2490, 2492, 53 L.Ed.2d 557 (1977).

Drysdale Securities Corporation ("DSC"), a broker-dealer registered with the SEC and regulated by the New York Stock Exchange, operated a business in U.S. Government obligations including United States treasury bonds, notes and bills. From December 1979 to February 1982, DSC's government securities business was conducted by David Heuwetter. This operation was taken over by DGSI, a newly formed corporation, as of January 31, 1982, and was continued by DGSI under Heuwetter's direction until May 17, 1982 when DGSI defaulted on payments of over $160 million in accrued coupon interest obligations. (Complaint at ¶¶ 31–32).

This default occurred as a consequence of DGSI's repurchase and reverse repurchase agreements in what is called the "repo" market in U.S. Government obligations. (Complaint at ¶ 42). In its repurchase agreements, DGSI loaned U.S. government obligations to third parties in return for cash. These agreements provided that DGSI would repay the cash, with interest, at a specified date, and that the third parties would return the same or similar U.S. government obligations. Ownership of the U.S. government obligations did not change, and the owners remained entitled to all coupon interest which accrued during the term of the agreements. (Complaint at ¶¶ 34–39).

In its reverse repurchase agreements, DGSI borrowed U.S. government obligations from third parties and loaned cash in return. DGSI was obligated to return the same or similar U.S. government obligations at a specified date, and the third party was required to repay the cash, with interest, to DGSI. Again, ownership of the U.S. government obligations did not change, and the owner remained entitled to coupon interest which accrued during the term of the agreements. (Complaint at ¶ 39). *See generally SEC v. Miller*, 495 F.Supp. 465 (S.D.N.Y.1980).

DGSI followed the earlier practice of DSC, generating working capital for its government securities business by taking advantage of prevailing pricing practices in the government securities markets. At that time, the purchaser of a government security in a reverse repo transaction did not pay the seller accrued coupon interest as part of the purchase price but remitted it when the coupon matured. In contrast, the purchaser of a government security in the cash or outright market was required to pay the accrued interest as part of the purchase price (Complaint at ¶ 39). This disparity enabled DGSI to obtain securities through reverse repos, sell them to dealers in the outright market, and immediately realize the accrued interest. Using this strategy, DGSI had use of the interest until the coupon payment dates. However, once the securities were sold outright, DGSI had to purchase securities in the cash market in order to redeliver them to the reverse repo sellers at the close of the transaction. (Complaint ¶¶ 37–39, 53).

DGSI carried out these operations on a massive scale, its daily cash transactions amounted to over $100 million (Complaint ¶ 53), and DGSI's ability to carry out commitments to its trading partners depended on continually opening new reverse repo positions and selling the government securities thus acquired. (Complaint ¶¶ 42, 51, 53). When its reverse repo partners cut back on the open positions maintained with DGSI (Complaint ¶ 55), the firm collapsed.

In January 1982, Essner, an audit partner at the accounting firm of Arthur Andersen & Co., was retained by DSC to assist in the spin-off of its government securities business (Complaint at ¶¶ 26, 43). Essner proposed a plan, which DSC implemented, to transfer DSC's government securities business to DGSI. (Complaint at ¶ 43). At the request of DSC's chairman of the board, Essner drafted a letter for distribution to various government securities dealers and banks, announcing DGSI's formation and representing its capital as $20.8 million. (Complaint at ¶¶ 44, 65). In fact, DGSI inherited from DSC its positions in government securities carrying with them a deficit of approximately $190 million. (Complaint at ¶¶ 40, 43, 52, 65).

To give DGSI greater credibility, Essner prepared, on behalf of Arthur Andersen, a certified statement of DGSI's subordinated debt and equity, accompanied by an unqualified audit opinion representing that the examination of DGSI's subordinated debt and equity had been made in accordance with generally accepted auditing standards. (Complaint at ¶¶ 45–48). In addition to repeating the representation that DGSI had capital of $20.8 million, the report materially misstated the net fair value of significant operating assets and liabilities which ostensibly had been transferred to DGSI in exchange for preferred stock. (Complaint at ¶¶ 48, 65). The report, issued on February 22, 1982, and dated February 1, did not disclose that $15.8 million of DGSI's capital was in fact loaned indirectly to it by DSC, and that on February 1, after DGSI opened for business, it transferred at least $12 million of these funds back to DSC. (Complaint at ¶¶ 49, 65(c)(3)). Essner knew that DGSI would use these documents to induce securities dealers and banks to engage in government securities transactions. (Complaint at ¶ 50).

### Conclusions

The SEC alleges that Essner's acts constitute violations of § 17(a) of the Securities Act, 15 U.S.C. § 77q(a) and Section 10(b) of the Exchange, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. These provisions make it unlawful to engage in fraudulent conduct "in connection with the purchase or sale of a security."[1] The issue that must be resolved here, in light of *Chemical Bank, supra,* is whether Essner's alleged misrepresentations with respect to DGSI's financial condition, but not with respect to the Government securities involved in the repo and reverse repo transactions, are "in connection with" the purchase or sale of a security. If the complaint does not satisfy the "in connection with" requirement, no cause of action under either § 17(a) or

§ 10(b) has been alleged, and the complaint must be dismissed.

■ The Honorable Henry J. Friendly, in *Chemical Bank, supra,* confronted the issue reserved by the Supreme Court in *Rubin v. United States,* 449 U.S. 424, 429 n. 6, 101 S.Ct. 698, 701, n. 6, 66 L.Ed.2d 633 (1981), namely "whether misrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves can form the basis of a violation of § 17(a)." *Id.* Judge Friendly concluded that they did not. That decision controls the result here.

In *Chemical Bank* plaintiff Chemical Bank and three other commercial banks had loaned $15.5 million to Frigitemp Corporation in a series of transactions from late 1975 to early 1977. In August 1977, the banks and Frigitemp executed a refinancing transaction which included a loan of $4 million to Frigitemp's wholly-owned subsidiary, Elsters, Inc., for which the banks received promissory notes of Elsters. Frigitemp guaranteed the notes and pledged as security 100% of Elster's common stock. This pledge constituted a sale and purchase under § 10(b). *Chemical Bank* at 939; *Mallis v. Federal Deposit Insurance Corp.,* 568 F.2d 824, 830 (2d Cir.1977), *cert. dismissed,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978). In March 1978, Frigitemp filed a petition in bankruptcy. The banks sued Andersen and three Frigitemp officers, alleging violations of § 10(b), Rule 10b–5, and § 17(a). Although Andersen had audited and reported upon Frigitemp's financial statements for the years 1973–76, Andersen had made no representations concerning Elsters or the value of its stock. The banks contended that but for the Frigitemp financial statements, which were prepared by Andersen, and were alleged to be false and misleading, the banks would not have entered into the loan transaction with Elster, which

---

1. The parties agree that the "in connection with" requirement of § 10(b) is indistinguishable in substance from § 17(a)'s requirement that the fraud be "in" the offer or sale of securities. *United States v. Naftalin,* 441 U.S. 768, 773 n. 4, 99 S.Ct. 2077, 2081 n. 4, 60 L.Ed.2d 624 (1979); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 942 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).

included the pledge of Elsters' stock. The banks argued further that the misrepresentations with respect to Frigitemp affected the entire Elsters transaction because Frigitemp's guarantee was less valuable than the banks had been made to believe and the banks would consequently have to rely more heavily on the pledge of Elsters' stock.

Judge Friendly held that the banks' showing that but for Andersen's description of Frigitemp the banks would not have renewed the Frigitemp loans or made the Elsters loan, which led to the pledge of Elsters' stock, was insufficient to satisfy the "in connection with" requirement. *Chemical Bank* at 943. Because Andersen's misrepresentation related to Frigitemp, and not the securities involved in the transaction, the pledged Elsters' stock, the "in connection with" requirement was not satisfied. The opinion explained:

> The purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be. Andersen is not alleged to have deceived the Banks with respect to the pledge of the Elsters stock; the Banks got exactly what they expected. Their showing is simply that but for Andersen's description of Frigitemp they would not have renewed the Frigitemp loans or made the Elsters loan which Frigitemp guaranteed, and, that if they had not done this, there would have been no pledge of Elsters' stock. Such "but-for" causation is not enough. The Act and Rule impose liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part.

*Id.*

■ In this case as well, the alleged misrepresentations by Essner and Andersen related to the capitalization of DGSI, not to the value of the government securities underlying the "repo" market or the financial stability of the issuer. Moreover, to the extent that Andersen's misrepresentations of Frigitemp's financial condition in *Chemical Bank* were indirectly relevant to the financial condition of Frigitemp's wholly-owned subsidiary, Elsters, and consequently the value of Elsters' stock, *see Chemical Bank* at 947 (Van Graafeiland, J. dissenting), Essner's report is that much more remote from the securities in this case. DGSI clearly has no such comparable relationship with the U.S. government.

The SEC relies, however, on *Competitive Assoc. Inc. v. Laventhol, K.H. & H.*, 516 F.2d 811 (2d Cir.1975), which was not expressly overruled by *Chemical Bank*, but was denied much of its precedential value by the reasoning and result of *Chemical Bank*. In *Competitive Assoc.*, Competitive Associates, ("Associates") a publicly held mutual fund, alleged that Laventhol, Krekstein, Horwath and Horwath ("Laventhol"), an accounting firm, in furtherance of a fraudulent scheme to induce Associates to retain Akiyoshi Yamada ("Yamada") and Takara Asset Management as managers of a part of Associate's portfolio, knowingly certified false and misleading financial statements of Takara Partners, a private investment fund managed by Yamada. As a result, Associates subsequently lost several million dollars from purchases and sales of securities which Yamada made, in his capacity as advisor. Associates alleged that the investment performance of Takara Partners was the primary criterion by which Yamada's expertise as an investment advisor was gauged and that the statements certified by Laventhol were materially false and misleading with respect to Takara's performance. Further, Associates alleged that Laventhol knowingly and with intent to defraud certified these statements in order to aid Yamada in attracting customers, thereby also creating a market for securities which Takara was manipulating. The court found on these facts that

the "in connection with" requirement was satisfied, holding that:

> The "in connection with" requirement has been broadly interpreted by the Supreme Court to require only that plaintiff shall have "suffered an injury as a result of deceptive practices touching its sale of securities as an investor." *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). The broad "touch" test enunciated in *Bankers Life* is certainly met by plaintiff's allegations that the very purpose of defendants' certification of Takara's financial statement was to aid in placing Yamada in a position where he could manipulate securities prices and sell these securities to investors attracted by Yamada's reputation and performance ... [P]laintiff here alleges that the accountants accepted payoffs and otherwise actively collaborated with Yamada for the specific purpose of influencing investors to authorize Yamada *to carry out security transactions on its behalf.*

*Id.* at 815 (emphasis supplied).

The court in *Chemical Bank* distinguished *Competitive Associates* because it involved "misrepresentation by an accounting firm with respect to an investment fund through which plaintiff intended to and did engage in massive trading in securities." However, the opinion in *Chemical Bank,* does not focus on the fact that the misrepresentations in *Competitive Associates* did not relate to the securities involved thereafter in the securities transactions. Moreover, *Competitive Associates* appears to rely upon the "but for" causation rejected in *Chemical Bank.*

Whether or not the proposition that the cases can be distinguished is accepted, the facts now before this court are closer to *Chemical Bank* than *Competitive Associates.* Repos and reverse repos have been conceded by the SEC not themselves to constitute securities, and the SEC has not altered its position in this case. (*See* Reply Mem. of Def. Essner, p. 2). The contact between the misrepresentation and the "massive" securities transactions that the court found in *Competitive Assoc.* is thus more direct than in the facts here. Whether or not the repos are characterized as loans merely collateralized by government securities, as Essner argues in order to make the facts of this case more parallel to those of *Chemical Bank,* the misrepresentation of DGSI's financial condition did not relate to the value of the government securities upon which the repo market was based. However, only by relying on the "but for" causation specifically rejected in *Chemical Bank,* which in my view effectively overruled the reasoning of *Competitive Associates,* could I find the "in connection with" requirement satisfied here.

SEC argues that *Chemical Bank* is distinguishable because that case arose from "a conventional lending relationship" with respect to which the pledge of Elsters stock was "merely an incident in a transaction not otherwise involving the purchase or sale of securities," *Chemical Bank* at 944 n. 24. The reasoning in *Chemical Bank,* however, hinged not on the degree to which the entire transaction involved securities, but rather on the extent to which the alleged misrepresentation was linked to the securities which were involved in the transaction. The linked misrepresentation is less direct here, and the motion is therefore granted as required by the holding of *Chemical Bank.*

The case is dismissed, and the clerk is directed to enter judgment.

IT IS SO ORDERED.