785 F.2d 38
 54 USLW 2464, Fed. Sec. L. Rep. P 92,487
 SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,
v.
DRYSDALE SECURITIES CORPORATION, David J. Heuwetter, Joseph
V. Ossorio, Dennis J. Ruppert, Warren Essner, Defendants,
Warren Essner, Defendant-Appellee.
 No. 85, Docket 85-6111.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 24, 1985.
Decided Feb. 21, 1986.
 
 Jacob H. Stillman, Associate General Counsel, S.E.C., Washington, D.C. (Daniel L. Goelzer, General Counsel, Rosalind C. Cohen, Asst. Gen. Counsel, Daniel J. Kraus, Paul Gonson, S.E.C., Washington, D.C., of counsel), for plaintiff-appellant.
 Peter Fleming, Jr., New York City, (Eliot Lauer, Mark H. O'Donoghue, Bernard V. Preziosi, Jr., Andrew S. Montgomery, Law Clerk, Curtis, Mallet-Prevost, Colt & Mosle, of counsel), for defendant-appellee.
 Before PIERCE, WINTER, and DAVIS,* Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 The Securities and Exchange Commission ("SEC") appeals from an order of Judge Sweet of the United States District Court for the Southern District of New York dismissing its complaint, 606 F.Supp. 295. The complaint alleged that appellee had violated the antifraud provisions of the federal securities laws. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1982), and Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1985) and Section 17(a) of the Securities Act of 1933, 15 U.S.C. Sec. 77q(a) (1982). Holding that the alleged fraud was not in connection with the purchase or sale of a security or in the offer or sale of a security as required respectively by Sections 10(b) and 17(a), Judge Sweet dismissed the complaint on the authority of Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930 (2d Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). We reverse.
 
 BACKGROUND
 
 2
 This case arises out of the collapse of Drysdale Securities Corp. ("DSC"), a broker-dealer registered with the SEC, and Drysdale Government Securities, Inc. ("DGSI"). This collapse caused losses to investors of about $300 million. The SEC brought this civil action against DSC, three officers of DSC or DGSI, and Warren Essner, an audit partner at the accounting firm of Arthur Andersen & Co. responsible for the preparation of allegedly false and misleading financial statements for DGSI.[1] For purposes of this appeal, the allegations of the complaint are of course accepted as true.
 
 
 3
 DSC began its government securities business in or about December, 1979, trading in both the cash or out-right market and the so-called "repo" market. In the cash market, DSC sold and purchased government securities from other dealers. In the repo market, which involves the transactions pertinent to the present case, DSC engaged in sale and repurchase agreements ("repos"), which were structured as sales of securities by DSC subject to an agreement by DSC to repurchase them from the other party at a fixed price at a later date. Under reverse sale and purchase agreements ("reverse repos"), DSC purchased government securities subject to an agreement to resell them to the other party at a fixed price at a later date. A repo and reverse repo are thus descriptions of the same transaction viewed from different sides.
 
 
 4
 In January, 1982, Essner was retained by DSC to assist in the spin-off of its government securities business. He prepared a plan to transfer this business to DGSI, which DSC implemented later that month. DSC sent a letter to banks and securities dealers on February 1 announcing the formation of DGSI. This letter stated that DGSI's capital was $20.8 million. It is alleged that DGSI actually had a deficit of $190 million that it inherited along with the government securities business from DSC. When the letter failed to produce the volume of business for which DGSI had hoped, Essner was asked to prepare a more formal document to give DGSI more credibility. Accordingly, Essner, on behalf of Arthur Andersen, prepared a certified statement of DGSI's subordinated debt and equity, accompanied by an unqualified audit opinion.
 
 
 5
 According to the complaint, Essner's preparation of these reports violated generally accepted auditing standards and/or internal Arthur Andersen procedures by failing to examine certain records, to investigate the "related party nature" of certain transactions, and to have a person outside his audit team check the final report against work papers. The report, issued on February 22 and dated February 1, again failed to disclose the capital deficit or that $15.8 million of DGSI's capital was loaned to it by DSC, of which $12 million was repaid shortly after DGSI opened for business on or about February 1. Essner knew that the documents he prepared would be used by DGSI to induce customers to do business with it.
 
 DISCUSSION
 
 6
 The precise legal issue before us is whether the fraud alleged is either in connection with the purchase or sale of a security, as required by Section 10(b), or in the offer or sale of a security, as required by Section 17(a). This issue arises because there is no allegation that DGSI or Essner misled investors with respect to the value of the government securities traded by DGSI rather than with respect to DGSI's financial health. Judge Sweet viewed repos as indistinguishable from collateralized loans and thus held that our recent decision in Chemical Bank controlled the outcome. We disagree.
 
 
 7
 In Chemical Bank, Frigitemp, a publicly held company, entered into a secured financing agreement with various banks in 1975, including Chemical. In this transaction, the banks provided Frigitemp with an $8 million line of credit and took a security interest in Frigitemp's customer notes receivables. Within a year, it became clear that Frigitemp would need to restructure its debt. A restructuring took place in August, 1977 pursuant to which the maturity dates of certain notes issued under the secured credit agreement were extended, certain unsecured notes were replaced with other unsecured notes, and $4 million in fresh cash was advanced to Elsters, a wholly-owned Frigitemp subsidiary. In exchange for the advance to Elsters, the banks received Elsters' promissory notes, which were guaranteed by Frigitemp, and a pledge by Frigitemp of 100% of Elsters' common stock as security. Frigitemp filed a petition in bankruptcy in March, 1978. The banks, holding substantial unpaid Frigitemp loans, sued three of Frigitemp's principal officers and Arthur Andersen, Frigitemp's auditor. The banks claimed that Arthur Andersen knew that Frigitemp had submitted false and misleading financial statements in order to obtain financing, and that these misrepresentations were in connection with the pledge of the Elsters stock for purpose of the antifraud provisions.
 
 
 8
 We held that the pledge of the Elsters stock was a purchase and sale of a security for the purposes of Section 10(b) on the authority of Mallis v. Federal Deposit Insurance Corp., 568 F.2d 824 (2d Cir.), cert. granted, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977), cert. dismissed as improvidently granted, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978). We also held, however, that misrepresentations regarding the financial health of Frigitemp could not form the basis of a violation of Section 17(a), Section 10(b), or Rule 10b-5 despite the fact that Frigitemp had pledged securities in order to procure the advance for Elster. Judge Friendly's opinion noted:
 
 
 9
 Andersen is not alleged to have deceived the Banks with respect to the pledge of the Elsters stock; the Banks got exactly what they expected.... The Act and Rule impose liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part.
 
 
 10
 Chemical Bank, 726 F.2d at 943.
 
 
 11
 In our view, the instant case is distinguishable. Repos differ from traditional collateralized loans in a way that magnifies the importance of Essner's alleged misrepresentations.[2] Moreover, such misrepresentations directly involve the consideration for a securities transaction and are thus closely linked to transfers of securities, unlike the misrepresentation in Chemical Bank.
 
 
 12
 Essner attempts to fit the present case within the rationale of Chemical Bank by characterizing a repo as a short-term, collateralized loan. In Essner's view, when DGSI engaged in a repo transaction, it borrowed cash, delivered the securities as collateral, and agreed to pay off the loan with interest by repurchasing the securities at a fixed price. Essner thus states:
 
 
 13
 That the parties were obliged to repay and redeliver at the end of the transactions was no more a part of the consideration and no different in kind than the normal obligations of any lender to release security upon repayment of debt or of any borrower to repay cash debt.
 
 
 14
 (Brief of Appellee at 25-26) (footnote omitted).
 
 
 15
 Essner ignores a most significant difference between repos and standard collateralized loans, however. In the latter transaction, the lender holds pledged collateral for security and may not sell it in the absence of a default. In contrast, repo "lenders" take title to the securities received and can trade, sell or pledge them. The repo merely imposes a contractual obligation to deliver identical securities on the settlement date set by the repo contract. Unlike the lender in Chemical Bank, therefore, the secured "lender" in a repo is free to deal the "collateral."
 
 
 16
 This difference between repos and ordinary secured loans plainly magnifies the importance of the financial position of the parties, and thus of Essner's alleged misrepresentations, in a way directly affecting the transaction in securities. In this respect, the instant case closely resembles A.T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir.1967), and United States v. Naftalin, 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979). In Brod, we held that a scheme of placing purchase orders for securities with the intent of paying for them only if they had appreciated by settlement date was actionable under Section 10(b). In Naftalin, the Supreme Court found Section 17(a) liability for the flip side of Brod. In that case, a broker placed sell orders for shares he did not own with the hope of profiting by purchasing them at a price below the price of his sale. When, prior to settlement, the prices of the "sold" shares rose sharply, Naftalin's undisclosed scheme collapsed.
 
 
 17
 The scheme in which Essner is alleged to be a party closely resembles those held actionable in Brod and Naftalin. When DGSI engaged in a repo, it agreed to repurchase securities at a fixed price at a later date. Given its alleged insolvency from birth, its ability to make good on this agreement was more dependent upon the appreciation of the underlying securities than it would have been had it been financially healthy. Similarly, in a reverse repo, DGSI's ability to honor its obligation to resell securities depended upon its financial health since its common practice, like that of typical government securities dealers, was to sell immediately the securities received in a reverse repo either for cash or in another repo. Thus, in order to resell the securities upon settlement date of a reverse repo, DGSI had to purchase identical securities, something which its insolvency may have rendered impossible.[3] Even if it did not resell immediately, the securities held by DGSI were DGSI assets available for satisfaction of its debts and thus could be seized by creditors, an eventuality directly related to DGSI's financial condition. Repos are thus critically different from the secured loans involved in Chemical Bank.
 
 
 18
 Moreover, Chemical Bank states that fraud pertaining to the consideration in a securities transaction is in connection with that transaction. Specifically, Chemical Bank states:
 
 
 19
 The purpose of Sec. 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions--to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.
 
 
 20
 726 F.2d at 943.
 
 
 21
 Essner's misrepresentation clearly pertained to a significant part of the consideration offered by DGSI in repos and reverse repos. In both transactions, part of the consideration offered by DGSI was a promise--in repos to repurchase and in reverse repos to resell--that its insolvency rendered worthless. Unlike a pledge of securities in a traditional secured financing, in which the financial health of the lender is irrelevant to the value of both the pledged securities and the pledge itself, DGSI's financial strength was essential to the value received by the other party in a securities transaction.
 
 
 22
 In addition, Judge Friendly's discussion in Chemical Bank of Weaver v. Marine Bank, 637 F.2d 157, 159-60 (3d Cir.1980), rev'd on other grounds, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), supports the view that the former decision does not control this case. 726 F.2d at 944. In Weaver, plaintiffs pledged a bank certificate of deposit ("CD") to the bank as security for their guaranty of the debt of a third party. Plaintiffs claimed that the bank misrepresented the financial condition of the third party in procuring this guaranty and pledge. The third circuit, holding the CD to be a security,[4] decided that the bank's misrepresentations were in connection with the pledge of the CD and thus actionable under Section 10(b).
 
 
 23
 Chemical Bank distinguished Weaver, noting that the misrepresentations in Weaver induced the pledge, whereas the misrepresentations in Chemical Bank induced the banks to make a loan collateralized in part by a pledge. 726 F.2d at 944. The distinction is that in Weaver, as in the instant case, securities were transferred as a direct result of a misrepresentation, whereas in Chemical Bank the direct result of the misrepresentations was a loan and not a securities transfer.
 
 
 24
 Reversed and remanded.
 
 
 
 *
 The Honorable Oscar H. Davis, Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 The SEC dropped its action against DSC when the firm was dissolved. The individual defendants other than Essner have consented to the entry of permanent injunctions without admitting or denying the SEC's allegations
 
 
 [2]
 The SEC does not contend in this case that repos or reverse repos are securities within the meaning of the relevant legislation. Our discussion is based on the assumption that they are not
 
 
 [3]
 According to the complaint, DGSI was able to stay afloat for the less than four months of its operation by exploiting a pricing difference between the cash and repo markets. In the cash market, a purchaser was required to pay the accrued coupon interest on a security as a part of the purchase price, whereas in a reverse repo, a purchaser did not pay for this accrued interest but instead remitted the interest to the seller when the coupon matured. Therefore, DGSI was able to stay afloat by continually acquiring securities at something of a discount via reverse repos, and selling them immediately in the cash market for a price that included accrued coupon interest income. DGSI's reverse repo positions exceeded its repo positions by about $1 billion to $2 billion and, when its reverse repo customers reduced their positions, the firm collapsed
 
 
 [4]
 This part of the decision was later reversed by the Supreme Court. See 455 U.S. 551, 556-59, 102 S.Ct. 1220, 1223-25, 71 L.Ed.2d 409 (1982)