UNITED STATES of America,
Plaintiff-Appellee,

v.

A. Henry TAGER, Defendant-Appellant.

No. 85–3196.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 16, 1986.

Decided April 10, 1986.

James R. Wyrsch (argued), Koenigsdorf, Kusnetzky & Wyrsch, Kansas City, Mo., Charles E. Atwell, Frank E. Haddad, Jr., Louisville, Ky., for defendant-appellant.

Christian H. Stickan (argued), Asst. U.S. Atty., Cleveland, Ohio, for plaintiff-appellee.

Before MERRITT and WELLFORD, Circuit Judges, and EDWARDS, Senior Circuit Judge.

WELLFORD, Circuit Judge.

A. Henry Tager, appellant, appeals his convictions on all four counts of the indictment; one count of securities fraud (15 U.S.C. § 78j(b), 15 U.S.C. § 78ff, 17 C.F.R. § 240.10b–5); two counts of wire fraud (18 U.S.C. § 1343); and one count of mail fraud (18 U.S.C. § 1341).

This appeal involves defendant's alleged involvement in what the government has·

charged to be a "free riding" scheme to defraud a Cleveland broker-dealer in respect to a series of securities transactions.

Defendant, in his appeal, cites as based for reversal numerous asserted evidentiary errors, an alleged "constitutional" issue, and insufficiency of the evidence underlying his conviction.

The government alleged that Tager was involved in a scheme whereby he would order stock at a price quoted on the trade date, and if the stock increased in value prior to the settlement date, he would liquidate the ordered securities. In this event, the proceeds from the sale would cover the cost of the purchase with any excess representing a "free rider" profit. On the other hand, if the stock declined in value after the purchase order was filled, the risk would then fall upon the unwitting broker. Such a scheme rests on representations inducing the broker to extend credit. The government charges that at the time Tager ordered the stock involved in the indictment charges, he did not intend to pay for it unless its value increased.

Defendant was introduced to Mattlin, a broker-dealer who worked for Mericka & Co. in Cleveland, Ohio. Defendant represented to Mattlin that he operated a large travel agency and that he had considerable experience in stock investments. Tager further represented that he was acting for a group of investors that had purchasing power to buy large amounts of stock, indicating that this group relied on him to select the stocks for investment. He identified the members of his group as Harold Pittell, represented as a federal court official (in fact, a court reporter), William LeMaster, a bank president, and Loren Rea, an attorney.

Subsequently, on July 14, 1982, defendant placed a purchase order with Mericka for the purchase of 28,500 shares of Cook United, Inc. (Cook); 10,000 for Pittell at $40,000; 10,000 shares for William LeMaster at $40,000; and 8,500 shares for World-

wide Export Corporation for approximately $35,000. Defendant placed these orders as "cash" transactions, allowing him five business days from the time of the order to pay the full purchase price of the stock to Mericka, which had extended its credit to fill these orders.[1] Defendant specifically indicated to the broker that he was not buying these shares "on margin" or on a credit basis. Based upon prior conversations with defendant, Mattlin, the Mericka broker who took this order, was convinced that defendant was a substantial, knowledgeable, and sophisticated investor.

In placing this order of Cook stock for Worldwide Export Corporation (WEC), defendant indicated that WEC was "his" corporation; Mattlin considered WEC, therefore, to be defendant's alter ego. Other testimony at trial from defendant's longtime "personal broker", Lowell Listrom of Kansas City, Missouri, established that defendant operated and controlled a WEC account along with other personal and business accounts at Listrom's company. Since defendant traded in the WEC account there as if it were his personal account and assured Listrom that all accounts were actually his accounts, Listrom treated all accounts of Tager's related entities as if they were Tager's personal accounts. It would apply funds from any of these Tager entity accounts to cover losses in any other Tager account.

On July 19, 1982, five days after ordering the Cook stock, the defendant again placed with Mattlin an order, as a "cash" transaction, for 20,000 shares of Nord Resources Corporation (Nord) for the WEC account for a total in excess of $151,000 and 10,000 shares of Nord for Loren Rea for an amount exceeding $75,000. Payment for the Cook stock was pending at the time of the Nord stock transactions.

On July 23, 1982, defendant informed Mattlin that checks were in the mail for payment for both the Cook and Nord stock. Several days later, Mattlin's company re-

---

1. This exchange procedure is called a "cash" transaction. The date the order is placed is the trade date, while the date when payment is due, usually five "business days" after the order, is the settlement date.

ceived no checks, but four mailgrams instructing the broker to "bank deliver" the Cook stock (for Pittell, LeMaster, and WEC), and the Nord stock (for WEC) to a Kansas City bank.[2] "Bank delivery" is a method of payment for stock, generally prearranged with the broker at the outset, requiring the broker to send the stock certificates to a bank designated by the customer. The bank handles collection, usually by debit to the customer's account, forwards payment to the broker, and receives the certificates for the customer.

Upon the unexpected receipt of these mailgrams, Mattlin contacted defendant who assured him that if the certificates were bank delivered, payment would be made promptly. The president of Mericka & Co., however, informed defendant that he was going to be forced to sell the shares at the then market price since they were not paid for in accordance with the "cash transaction" understanding. At this time, the price of both the Nord and Cook stock had not changed materially. Tager urged Mericka not to sell the stock, claiming a misunderstanding about the method of payment. He persuaded the broker to authorize bank delivery for the Cook and Nord stock.

Mericka received payment for the Cook stock from Pittell and LeMaster about three weeks after the trade date and from WEC almost a week thereafter. Payment by Rea for the Nord stock was not received until August 19, 1982. This left outstanding payment on the 20,000 shares of Nord ordered for WEC, bank delivered on August 4, 1982.

The Nord stock for WEC remained at the designated bank for almost a week, when it was returned without payment. Mattlin promptly contacted defendant about this stock, and defendant informed him that he could pay for one half of the ordered Nord stock if a second bank delivery were arranged. A second bank delivery of 10,000 shares of Nord was then made by the broker on defendant's instructions to the same bank in Kansas City. Once again Tager and/or WEC failed to pay for the stock. A former official at the bank testified that he had personally contacted the defendant, who, despite assurances to the contrary, failed to present himself at the bank to make payment. Once more, the Nord stock was sent back to the broker.

On September 1, 1982, seven weeks after the trade date, the defendant visited the offices of Mericka & Co. in Cleveland and represented to both Mattlin and Mericka that he was making arrangements to pay for at least 8,000 shares of the Nord stock he had ordered and that he would pay for these shares within ten days. Based on these representations, Mericka then delivered 8,000 shares of Nord to a designated agency in Kansas City on September 10, 1982. Again, despite assurances made by the defendant to officials at the designated agency that he was coming in to pay for the stock, Tager failed to carry out these assurances.

By August 4, Nord stock had declined from $7.50 per share, the settlement date price, to $5.00 per share. The Nord stock, moreover, never recovered and after the defendant was called upon to pay for the stock ordered, it was sold out by Mericka for between $5.00 and $5.50 per share.

Defendant tried to intimate through cross-examination and later in argument to the jury that Mattlin had given him false inside information regarding the Cook stock. Defendant claimed, therefore, that he was entitled to some kind of set-off on the Nord stock. Mattlin specifically denied ever giving any "inside" information to the defendant, and no evidence was ever presented to support Tager's argument. The testimony, if believed, and documents

---

2. During the same period of time defendant was representing to Mericka & Co. that he was able to pay for the 20,000 shares of Nord stock he had ordered for WEC, he also placed orders for the same stock with Listrom, which he did not, or could not, pay for because the value of the stock declined. Listrom's records disclosed that on July 27, 1982, the day after the defendant sent his mailgrams to Mericka & Co., he ordered from Listrom 3,500 shares of Nord at $7.00 per share.

supporting the testimony clearly indicated that the defendant never invested any of his own money in the Cook stock. Rather, unknown to Harold Pittell, Tager used the latter's money to pay for his own Cook stock order.

At trial, various witnesses testified concerning representations made by Tager concerning these transactions. Pittell testified that he was never a part of any investment group with LeMaster, Rea and WEC. He further indicated that until the Cook trade he had merely allowed defendant to conduct trades in Pittell's name, using Pittell's credit to acquire stock only for Pittell's account. Pittell agreed to split the profits and losses he financed from these trades arranged with the defendant, using Pittell's financial resources. Defendant told Pittell that he would arrange for him to buy in and sell out of the Cook stock as a quick "in and out" transaction, and that Pittell would not have to put up any of his own money or credit for the Cook transaction as he would be able to sell out for a quick profit.

After defendant had ordered the stock through Mericka for Pittell's account and when the expected price rise in Cook stock did not materialize, defendant told Pittell that he had made arrangements for Pittell to borrow the necessary money to pay for the Cook stock from the Kansas City bank (herein indicated as the delivery bank). When Pittell went to that bank, however, he found that no loan arrangements had been made as represented. Pittell then arranged a loan himself, secured by his own collateral, to pay Mericka for the Cook stock.

Unknown to Pittell, his 10,000 shares of Cook, for which he had paid, were then transferred to the original delivery bank. That bank presented this Cook stock along with WEC's 8,500 unpaid for shares to Pittell's margin account at Listrom. Tager submitted for Pittell's signature an application for a margin loan of $34,595 against the 18,500 Cook shares in Pittell's account on August 5, 1982 payable to the original delivery bank. Part of Pittell's funds ob-

tained through the loan were used to pay for the 8,500 shares of Cook stock ordered by WEC. Again, these complicated facts were unknown to Pittell at the time.

After Pittell paid for his 10,000 shares of Cook stock, he never received possession of the stock and did not know how the Cook stock was delivered into his account and $34,595 was issued out of the account. While Pittell identified his signature on a handwritten letter authorizing Listrom to issue $34,595 out of his account, Pittell identified the handwriting into the body of the letter as being the defendant's. Pittell further testified that if he had known that the $34,595 which was loaned out of his margin account was going to pay for Cook stock ordered by WEC, he would not have authorized the margin loan. In any event, Pittell remained responsible and at risk on the 18,500 shares in Cook stock until they were sold out of his margin account with Listrom on March 17 and 18, 1983. This stock was carried in Pittell's account until it increased in value above the purchase price, and only then was it sold on defendant's instructions.

FBI Special Agent Brasmer testified that he had interviewed the defendant on November 3, 1982, some five months after the Cook and Nord stock purchases. At that time, defendant admitted that he believed that *he* still had an obligation to pay Mericka & Co. for the 20,000 shares of Nord which *he* had ordered from Mericka & Co. Defendant did not consider this to be anything other than a personal transaction and debt rather than that of WEC. The defendant further admitted to Agent Brasmer that he had planned to pay for the Nord stock he had ordered by "turning over" or selling the Cook stock.

Based upon this factual background, defendant was indicted and convicted by a jury. Defendant appeals that conviction.

I. *Admissibility of evidence of outstanding tax judgment and insufficient funds checks*

Tager assigns as error the admission at trial of evidence of a 1973 unpaid tax judg-

ment against him in an amount exceeding $500,000. Defendant objects to admissibility of this evidence on the grounds that it was irrelevant under Fed.R.Evid. 401, that it was unfairly prejudicial under Fed.R.Evid. 403, and that it was also an impermissible attempt to show that defendant had bad character under Fed.R.Evid. 404(b).

■ It is not error to admit evidence of the tax judgment if it is relevant in this case to establish motive as well as intent, an element of the crimes charged. *See, e.g., United States v. Zipkin,* 729 F.2d 384, 390 (6th Cir.1984); *United States v. Reed,* 639 F.2d 896, 907 (2d Cir.1981). The government argues that the unpaid judgment dating from 1973 was relevant not only to prove fraudulent intent by showing the falsity of the defendant's representations to Mericka & Co. concerning his financial condition, but also that it was relevant to show the defendant's motive for the "free riding" scheme and for using a corporate name instead of his own to insulate any profits from forfeiture or seizure for the tax debt. We find the admission of the outstanding tax judgment to be relevant and therefore admissible under Rule 401.

While admission of this evidence had potential for prejudice, the trial judge is to be accorded broad discretion in evaluating the impact of evidence under Rule 403, and we find that admission of the evidence in question was not an abuse of discretion. *See United States v. Robinson,* 560 F.2d 507, 514–15 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). We conclude also that the district court did not commit error in admitting the evidence for valid purposes under Fed.R.Evid. 404. The evidence was not admitted to show a prior criminal act or to show Tager's "bad" character as proscribed under Fed.R.Evid. 404(b), but was allowed as competent proof of plan, motive, and intent to defraud.

■ Defendant also assigns as error admission into evidence of two checks issued by him, which were later dishonored, for his contemporaneous "purchase" of the Nord stock from Mericka & Co. The trial judge, however, did not abuse her discretion in allowing this proof under Fed.R.Evid. 401, 403, and 404(b). Again, the court determined that these acts or conduct of the defendant were admissible for a *proper* purpose such as to prove motive, intent, and knowledge, as distinguished from the improper purpose of showing character or a propensity to commit an offense. *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). In our view, the trial court properly found that the checks were relevant evidence of defendant's current financial condition to show defendant's knowledge that, if he made concurrent statements to Mericka & Co. concerning his financial ability to pay for stocks, he knew the representations of financial worth were false and he acted with fraudulent intent. *See United States v. Reed,* 639 F.2d 896 (2d Cir.1981). In *Reed,* defendant's insufficient funds checks given in connection with a contemporaneous stock offering were admitted under Rule 404(b) as evidence of the defendant's intent to defraud in a similar "free riding" scheme, as well as showing a common scheme or plan.

Under Rule 10b–5, the defendant's intent to defraud can be inferred from the totality of the circumstances and the actions of the parties. *Henderson v. United States,* 202 F.2d 400 (6th Cir.1953). In securities fraud cases such as this, similar act evidence has been regarded as especially relevant and probative where the defense is a lack of fraudulent intent or where the making of misrepresentations is disputed. As stated in *United States v. Birrell,* 447 F.2d 1168, 1172 (2d Cir.1971), *cert. denied,* 404 U.S. 1025, 92 S.Ct. 675, 30 L.Ed.2d 675 (1972):

> Evidence of similar acts in fraud cases may be introduced where knowledge or intent is at issue, to give rise to an inference of knowledge or intent, or where the actual making of the misrepresentations is at issue, to establish the existence of a larger continuing plan or design. *United States v. Freedman,* 445

F.2d 1220 (2d Cir.1971). C. McCormick, Law of Evidence, § 164 (1964).

## II. *Exclusion of impeachment witness*

■ Defendant sought to present testimony from Peter Putnam to impeach Mattlin's credibility. Putnam had testified in voir dire that he believed Mattlin's truthfulness was "very bad." Putnam's assessment of Mattlin's veracity arose from an incident occurring between the two men more than eleven years before the trial. Putnam had filed a complaint against Mattlin before the National Association of Securities Dealers (NASD) for making misrepresentations regarding the use of inside information. Mattlin was sanctioned as a result. Defendant contends Putnam's testimony was relevant and that his constitutional rights were violated in denying him this evidence to impeach Mattlin.

When Mattlin testified, however, he was confronted by Tager's counsel in a thorough cross-examination about these charges. Defendant was to call Putnam to testify about the charges and give his opinion that Mattlin was untruthful. It is not clear whether this exclusion was based on the remoteness of the incident or because it was merely cumulative. Defendant asserts that Fed.R.Evid. 608(a) permits opinion evidence and does not place temporal restrictions on a witness' testimony; rather it requires only the witness' personal knowledge.

Defendant relies upon *United States v. Davis*, 639 F.2d 239, 244 (5th Cir.1981), a case which held that under its facts it was error to exclude witnesses offered by a criminal defendant. This case is distinguishable from *Davis* because the event about which Putnam would have testified was remote in time. Also, the testimony of the witness sought to be impeached in *Davis* was described as "essential" and "without which the government would have no case." 639 F.2d at 245. Putnam's testimo-

ny was essentially cumulative, repeating facts already admitted by Mattlin in his own testimony.

[S]uch evidence may be excluded if its probative value is substantially outweighed by its needlessly cumulative nature. Fed.R.Evid. 403. Whether such evidence is needlessly cumulative to the extent that its probative value is outweighed is a determination which lies within the sound discretion of the trial court and that discretion is generally viewed as very broad.

*Id.* at 244. Even if the court's action were deemed to be an abuse of discretion, under the circumstances we are satisfied that it was harmless error. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## III. *Sufficiency of the evidence*

In examining defendant's claims that the evidence was insufficient to support his convictions, we view the evidence and all reasonable inferences therefrom in a light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Chandler*, 752 F.2d 1148 (6th Cir.1985). This test applies although much of the evidence supporting the conviction is circumstantial. *United States v. Kirk*, 584 F.2d 773 (6th Cir.), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 708 (1978).

■ Defendant argues that the government failed to prove his intent to deceive. He also points to an alleged violation of Regulation T on the part of Mericka and asserts that his actions are consistent with his innocence and with his effort to work out a set-off of his account for the broker's alleged violations.

Under the rationale of *United States v. Naftalin*,[3] 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979), and *United States v. Reed*, 639 F.2d 896 (2d Cir.1981), however, we are satisfied that the government has

---

**3.** We find, contrary to the dissent's characterization, appellant's conduct, actions, and words fully analogous to the false statement made by the defendant in *United States v. Naftalin* with respect to Tager's known financial inability to pay when payment was due for the stock ordered.

adduced sufficient proof to establish the essential elements of each count of criminal fraud in respect to securities transactions. These were personal market transactions initiated by Tager, wrongfully inducing a broker to commit its resources and placing them at risk subject to the vagaries and fluctuations of market price. There was ample evidence, if believed by the jury, to indicate that Tager misrepresented his financial situation and that he did not intend at the outset to carry through with the transaction unless the price of the ordered stocks rose, enabling him to make a profit. Furthermore, defendant accomplished his plan through material misrepresentations, lulling the broker into transferring the risk to itself.

The dissent dismisses this prosecution as presenting a "disparate mass of confused facts." We find, on the other hand, that the facts support the government's "free rider" theory through a web of circumstances strongly pointing to appellant's fraudulent dealings in securities through use of the mails, wire communications, and otherwise. Tager's dealings with Mericka throughout the relevant period bespeak deceit and misrepresentation; it is seldom that criminal fraudulent intent can be proved directly, and here there was ample proof for the jury properly to find that Tager acted with the requisite "bad" intent to violate the laws which he was charged with violating. The confusing web of facts presented before us, therefore, directly arose from Tager's "practice to deceive."

Since the indictment sufficiently set out the elements of the offenses charged and because we find the evidence, albeit primarily circumstantial, to be sufficient, we accordingly overrule this contention of error.[4]

For the reasons indicated, we AFFIRM the judgment of the district court upon the guilty verdicts of the jury.

MERRITT, Circuit Judge, dissenting.

This case is a disparate mass of confused facts in search of a theory of criminal liability. I do not believe the Court in its struggle to uphold the verdict has found one that hangs together.

The government asserts that the defendant engaged in a "free rider" securities scheme in which he placed an order for Cook securities and an order for Nord securities causing the broker on the date of purchase to extend credit for five days until the date of settlement. The fraud is said to consist of defendant's knowledge of his inability to pay the difference between the purchase price and the market price on the settlement date if the price declined. I cannot find in the record the false statement of fact by defendant on which the broker relied as inducement to place the orders and extend the credit for five days. The broker extended the credit because the defendant placed the orders. No false financial statement was given, and I can find no false statement of fact which induced the credit when the purchase was made. The fact that defendant later paid for all the Cook stock and some of the Nord stock with funds obtained from friends by devious means seems to me irrelevant to the charge that he obtained by fraud the extension of credit at the time of purchase. A five year prison sentence should stand on a more solid foundation of fraud than this.

*United States v. Naftalin*, 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979), is not in point because there the customer induced the broker to engage in a short sale of stock by falsely representing that he owned the stock sold. Here there was no similar false statement of ownership or financial ability which induced the broker to take the order and extend credit until the settlement date.

District Judge Aldrich permitted large quantities of government evidence on defendant's previous federal income tax problems, the unsuccessful bank delivery of the stock and the defendant's relationship with various individuals and corporations with whom he did business. Presumably the evidence was relevant to show that when the defendant placed the two orders for

4. Defendant raised numerous other evidentiary challenges that are without merit.

stock he had no money to meet the five day credit deadline. This evidence apparently convinced the jury that the defendant was a hustler and a man of devious character who did not have assets to pay for the securities when he ordered them. But this evidence should not be allowed to obscure the point that the government failed to prove a false statement of fact made by defendant to the broker as an inducement for the extension of credit. The fact that the broker was "convinced that defendant was a substantial, knowledgeable and sophisticated investor" when he sold him the stock (opinion, 350) does not prove the kind of clear misrepresentation of fact needed to send a man to prison for five years for securities fraud.