SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**Jury Matt HANSEN, Fergus M. Sloan, Jr., Fermat Associates, Graycliff International, S.A., d/b/a 76 Other Entities, and Toronto Dominion Bank, Defendants.**

#### No. 89 Civ. 5242 (RO).

United States District Court, S.D. New York.

Nov. 22, 1989.

allegation of malice or reckless disregard of plaintiff's rights.

S.E.C., New York City (Jeffrey R. Zuckerman, Jeffrey Plotkin, Mark S. Mandel, Paul Middlemiss, and Steven M. Cohen, of counsel), for plaintiff.

Summit Rovins & Feldesman, New York City (Ronald E. DePetris, Seth Kaufman, and Leonard D. Steinman, of counsel), for defendants Jury Matt Hansen, Fergus M. Sloan, Jr., and Fermat Associates.

OWEN, District Judge:

The Securities and Exchange Commission ("SEC") alleges that defendants Jury Matt Hansen, Fergus Sloan, Jr., and Fermat Associates, their company, engaged over a 5–year period in massive illegal "day-trading"—paying for securities bought earlier in the day through one brokerage firm with the proceeds of the sale of the same securities later in the same day through another brokerage firm—and disavowing the purchases where the securities fell too much in price between the time of purchase and sale. The SEC seeks to restrain defendants' business activities and to freeze their assets in anticipation of prevailing in this disgorgement action to the extent, the SEC asserts, of some $3,000,-000.[1]

On this record it appears that, in 1984, defendants, acting through a Panamanian corporation, Graycliff International, S.A., established at Toronto Dominion Bank (the "Bank")[2] a securities clearing account through which defendants engaged in the purchase and sale of securities from registered broker-dealers.[3] The Bank cleared defendants' transactions through a physical delivery system until 1986 when the Bank joined a computerized system through which it matched customer instructions with delivery orders received via computer from brokerage houses. Therefore, the Bank required two items to complete any transaction entered into by defendants: a delivery order and a customer authorization.

In the course of its computerized trading on behalf of defendants, the Bank typically received delivery orders before it received defendants' customer authorizations.[4] The evidence indicates that on several occasions the Bank received notice of a transaction via the automated system, but it failed to receive customer authorization from defendants. In those instances, the Bank declined to accept the transaction for clearance, instead remitting a "DK," or "Deny Knowledge," message to the selling institution. When instructions and orders did match, the Bank affirmed the trade.

---

1. In the context of an action alleging securities violations, the SEC must establish a strong *prima facie* case that a violation has occurred and a likelihood that such violation will be repeated absent judicial intervention. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir.1975); *SEC v. Musella*, 578 F.Supp. 425, 434 (S.D.N.Y.1984). This Court previously issued a temporary restraining order that granted the requested relief; that order is in effect pending disposition of this motion, and continues in effect until a new order is signed as provided herein.

2. The SEC originally named the Bank as a defendant in this action, charging it with violations of Regulation U and with aiding and abetting the defendants' Regulation X violations. The Bank subsequently agreed to an injunction relating to both charges.

3. Defendants established a "delivery versus payment (DVP), receipt versus payment (RVP)" account at the Bank. DVP/RVP "refers to an arrangement under which a creditor and a customer agree that the creditor will deliver to, or accept from, the customer, or the customer's agent, a security against full payment of the purchase price." 12 C.F.R. § 220.2(e). The evidence indicates that defendants used over 100 different brokers and traded in over 250 different accounts maintained in the assumed names of at least 76 entities, most of which had no assets or legal existence.

4. Under a typical DVP/RVP arrangement, the DVP/RVP account holder purchases securities through a broker-dealer who gets paid after delivering the securities to the bank. When the account holder sells securities through broker-dealers, the bank delivers the securities to the broker-dealer in return for cash payment. *See* Affidavit of Jeffrey Plotkin in Support of Plaintiff's Motion for Preliminary Injunction and Other Relief ¶ 25.

The SEC asserts that defendants' day-trading activities were unlawful for several reasons. First, according to the SEC, defendants fraudulently misled broker-dealers by misrepresenting their assets and by failing to disclose that securities would be paid for by proceeds from the sale of the same securities. Moreover, the SEC alleges that on several occasions when defendants executed stock purchases and the prices dropped and precluded defendants from reselling at a profit, defendants unlawfully withheld payment authorization.[5] Therefore, the Bank had to DK these purchases, leaving several broker-dealers with substantial unsatisfied debts.[6] The SEC asserts that such practices are chargeable under the general antifraud provisions of section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 17 C.F.R. § 240.10b–5.[7]

Second, the SEC contends that defendants' conduct was "free-riding"[8] in violation of Regulations T, U, and X, which govern minimum capital requirements.[9]

Regulation U regulates extentions of credit by banks for securities transactions.[10] Likewise, Regulation T restricts the type of credit arrangements broker-dealers may enter into with customers.[11]

Although primary liability for violations of Regulation U and Regulation T falls on banks and broker-dealers, respectively, section 3(b) of Regulation X imposes liability on a securities purchaser who causes a broker-dealer or bank to violate the credit restrictions. Therefore, in order for the SEC to establish that defendants violated Regulation X, it must first establish Regulation U and Regulation T violations in connection with defendants' securities transactions.

Accordingly, the SEC contends that defendants provided false and misleading new account information to broker-dealers, failed to inform broker-dealers that they lacked the financial resources to pay for purchases without applying sale proceeds, and fraudulently failed to authorize payments for stock purchase orders actually made by them.

**5.** In essence, the SEC believes that if defendants bought stock at $5.00 a share in the morning, and the stock dropped in value to $4.75 later in the day, defendants would not authorize the Bank to pay for the order. The Bank would "DK" the transaction, and the broker-dealers would lose the expected purchase price.

**6.** Specifically, the SEC alleges that defendants caused the following losses:

| Firm | Alleged Loss |
| --- | --- |
| Dominick & Dominick, Inc. | $124,000 |
| Universal Securities of America, Inc. | $218,000 |
| Merrill Lynch Pierce Fenner & Smith, Inc. | $ 19,312 |
| Steinberg & Lyman, Inc. | $ 91,550 |

When a broker-dealer does not receive payment for sales, it must either attempt redelivery or liquidate the securities. Defendants did not always DK purchases with the intent to withhold payment. The SEC acknowledges that, in some instances, defendants DK'd purchases to stall for time to resell the stocks; upon redelivery, defendants would acknowledge those trades.

**7.** Section 17(a) of the Securities Act governs fraud in the offer or sale of a security, whereas section 10(b) of the Exchange Act, and Rule 10b–5 thereunder, applies to fraud in connection with the purchase or sale of a security. If the SEC's allegations about defendants' trading

activities are correct, the SEC has made a sufficient showing that these general antifraud provisions reach such activities. *See United States v. Tager,* 788 F.2d 349 (6th Cir.1986); *A.T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir.1967).

**8.** "Free-riding" involves purchasing stocks without sufficient capital and using the proceeds of the sale of the same stock to cover the purchase price.

**9.** Regulations T, U, and X were promulgated by the Board of Governors of the Federal Reserve Board pursuant to the Exchange Act. Section 7(f) of the Exchange Act prohibits customers from obtaining extensions of credit in a manner inconsistent with the regulations promulgated by the Board of Governors of the Federal Reserve Board.

**10.** The SEC alleges that because defendants lacked sufficient funds to pay for their stock orders, the Bank unlawfully extended overnight credit to defendants in the amount of the purchase prices.

**11.** The SEC alleges that defendants failed to comply with Regulation T's requirement that purchasers be able to make full cash payment for securities purchased in a cash account before selling such securities.

The SEC has demonstrated that defendants conducted their trading activities through numerous assumed name sub-accounts of the Graycliff account,[12] and they gave these fictitious entities misleading names so as to suggest that they were legitimate corporations, pension funds or trust funds.[13] Moreover, defendants represented that these fictitious entities had substantial assets when in fact they had no income or assets.[14] Defendants' misrepresentations to broker-dealers about their payment intentions are actionable under Rule 10b–5. *See, e.g., SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 983 n. 7 (2d Cir.1974).

Likewise, the SEC has demonstrated that defendants concealed their financing arrangement from broker-dealers. Specifically, by trading through numerous accounts with several broker-dealers, defendants hid the fact that they were unlawfully using proceeds of sales to pay for the purchase of the same securities. In addition to the financial risk such actions placed on broker-dealers, defendants' omissions of fact caused several broker-dealers to violate Regulation T's 90–day freeze period. Such concealment constitutes fraud that is actionable under section 17(a) of the Securities Act and section 10(b) of the Exchange Act. *See, e.g., United States v. Naftalin*, 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979); *SEC v. Drysdale Secu-*rities Corp., 785 F.2d 38 (2d Cir.), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2894, 90 L.Ed.2d 981 (1986); *United States v. Tager*, 788 F.2d 349 (6th Cir.1986); *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir.1974); *A.T. Brod & Co., Inc. v. Perlow*, 375 F.2d 393 (2d Cir.1967).

The SEC's allegation that defendants knowingly placed purchase orders for stocks and then disavowed those orders if the price of the stock subsequently dropped in value has some support in the record before me, although not as strong or as broadly spread, and defendants contend that the entirety of this problem was attributable to unauthorized trading by certain brokers. Indeed, the SEC already has brought a civil action alleging unauthorized trading against William S. Craugh, the person who handled defendants' trading account at Steinberg & Lyman, Inc.[15] Similarly, the SEC currently is investigating similar allegations against Steven Blankstein, the broker who managed defendants' account at Universal Securities of America, Inc. However, while alleging that Blankstein and Craugh engaged in unlawful unauthorized trading, the SEC also alleges that defendants owe $91,550 to Steinberg & Lyman, and $218,000 to Universal Securities for transactions defendants DK'd.[16] Therefore, the SEC has made a sufficient *prima facie* showing as to the likelihood of

---

12. Documents establish that defendants provided the Bank with a list of 54 assumed names which they intended to clear through the Graycliff account.

13. For example, defendants titled some sub-accounts "Allen Investors," "Blackstone Corporation," "Buckhorn Endowment," and "Yellowstone Trust."

14. For example, the evidence demonstrates that defendants, using the name "Caledonia Investors," established an account with Smith, Barney, Harris & Upham. Defendants falsely represented that Caledonia Investors had an estimated annual income of $1,000,000 and an estimated net worth of $10,000,000. Defendants opened similar accounts at Merrill Lynch Pierce Fenner & Smith in the name of "Whitehall Associates." Defendants claimed that "Whitehall Associates" was an investment manager representing investors with a cumulative net worth of $1,000,000,00. Neither Caledonia Investors nor Whitehall Associates, it appears, has a legal existence, income or assets.

15. *See SEC v. Craugh*, 88 Civ. 3778 (KTD). Mr. Craugh admits that he engaged in some unauthorized trading in his customers' accounts, although he also states that some customers, including defendants, repeatedly ratified the unauthorized trades that were profitable.

16. Coincidentally, in a related case before me, Dominick & Dominick, Inc., a clearing broker is suing Lanark Investments, which the SEC believes is one of defendants' sub-accounts, for losses allegedly sustained when Lanark ordered 10,000 units of stock in Future Medical Services, Ltd. ("FMS"). *See Dominick & Dominick, Inc. v. Lanark Investments, Inc.*, 89 Civ. 3819 (RO). Broker Dominick claims that after Lanark confirmed its purchase it attempted to revoke its assent, and as a preliminary finding, I concluded that Lanark revoked its consent because the value of FMS dropped.

success on the merits with regard to its fraud allegations.

Turning to Regulation T, it regulates credit agreements between broker-dealers and their customers. In cash accounts such as the ones maintained by defendants, broker-dealers may

> buy for or sell to any customer any security if: (i) there are sufficient funds in the account; or (ii) the creditor accepts in good faith the customer's agreement that the customer will promptly make full cash payment for the security before selling it and does not contemplate selling it prior to making such payment[.]

12 C.F.R. § 220.8(a)(1).[17] Regulation T also requires that a broker-dealer impose a 90–day freeze on the account of any customer who violates this provision.[18]

The SEC has established a reasonable likelihood of success on its Regulation T claim against defendants. As discussed in the context of the general antifraud provisions of the securities laws, defendants' conduct, including material misrepresentations and omissions, misled broker-dealers and caused them to violate Regulation T. Accordingly, defendants are subject to liability under Regulation X. *See, e.g., SEC v. Packer, Wilbur & Co., Inc.*, 498 F.2d 978, 983 n. 7 (2d Cir.1974), which reads:

> None of this is to exonerate in any way a customer who deliberately misrepresents his intention of prompt payment.

If the bona fide intent of a customer should change after the broker had purchased stock for him, the customer could legitimately direct his broker to sell the stock. The effect, therefore, is a 90–day freeze, not a violation of Regulation T. The case of a customer who initially misrepresents his intention to his broker is different. He violates Regulation X, 12 C.F.R. § 224.1, and Rule 10b–5 by making this misrepresentation.

The evidence establishes that the broker-dealers with whom defendants traded were unaware of defendants' financing arrangements. Moreover, the SEC has demonstrated that defendants made material misrepresentations in order to evade compliance with the credit regulations. Accordingly, the SEC has made a *prima facie* showing that Regulation X imposes liability on defendants for those Regulation T violations.

Turning to Regulation U, it prohibits a bank from extending credit secured "directly or indirectly"[19] by margin stock in an amount greater than 50 percent of the purchase price.[20] Regulation X imposes liability on a borrower who "willfully causes" a violation of Regulation U.

It is conceded that the Bank did on occasion extend credit to defendants on margin stock, and that the value of that credit regularly exceeded 50 percent of the purchase price of the securities.[21] Moreover,

---

**17.** A customer's agreement to comply with Regulation T "need not be explicit. [A broker-dealer] may assume that a sophisticated and experienced investor ... knows the requirements of Regulation T and impliedly agrees to its terms when he places an order without immediate payment." *SEC v. Packer, Wilbur & Co., Inc.*, 498 F.2d 978, 981 n. 1 (2d Cir.1974) (*citing Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 469 F.2d 1166, 1175 (8th Cir.1972). Defendant Sloan clearly was aware of Regulation T's terms. In 1975 Sloan pled guilty to conspiracy to violate, among other laws, Regulation T and received a prison sentence.

**18.** The large number of accounts defendants maintained at various broker-dealers enabled them to avoid Regulation T's freeze provision. By not buying and selling through the same broker-dealers, defendants kept any one broker-dealer from suspecting a possible violation of Regulation T.

**19.** Regulation U's definitional section provides that the phrase "indirectly secured"

> (1) Includes any arrangement with the customer under which: (i) The customer's right or ability to sell, pledge, or otherwise dispose of margin stock owned by the customer is in any way restricted while the credit remains outstanding....

12 C.F.R. § 221.2(g).

**20.** *See* 12 C.F.R. §§ 221.1(a), 221.8. The SEC has demonstrated that some, although not all, of defendants' trading involved margin stocks. *See* Affidavit of Ira B. Spindler at 2–6.

**21.** The Bank extended credit to defendants each time it accepted delivery of securities for which the sell side of the transaction had not yet cleared. Since the Bank had physical possession of defendants' securities, the Bank extended purpose credit (100 percent of current market value) secured by margin stock in violation

the Bank's extension of credit was "directly or indirectly" secured by margin stock under the Collateral Agreement between defendants and the Bank giving the Bank a direct security interest in the stocks purchased by defendants.[22] *Cf. Halycon Securities, Inc. v. Chase Manhattan Bank, N.A.*, 439 F.Supp. 650 (S.D.N.Y.1977).

Defendants claim that, even if Regulation U does prohibit the financial arrangement between defendants and the Bank, Regulation X's exemption provision removes any resulting liability from defendants.[23] Defendants contend that Regulation X imposes liability on a borrower only when the borrower *causes* a credit extension violation and that since the Bank knowingly and voluntarily entered into the credit arrangement with defendants, it should be held solely responsible for any unlawful credit extensions.[24] The SEC contends that Regulation U liability should be imputed to a borrower whenever the borrower knowingly participates in the violation, without regard to the lender's culpability. I agree. Any other view of this makes little sense and would rarely have applicability.

Thus, the SEC having made the required preliminary showing that defendants have engaged in acts that constitute various securities violations, a preliminary injunction as requested is granted. The parties may submit proposed formal orders on notice. The parties also are directed to brief the Court by December 11, 1989, on the appropriate amount presently under seizure that should remain so frozen pursuant to the preliminary injunction this day ordered.

So ordered.

---

of Regulation U. Defendants artfully argue that they were not undercapitalized because the Bank *paid* for the securities purchased. Such formalistic reasoning cannot be used to circumvent the manifest purpose of the federal securities laws. The Bank indeed floated defendants the value of their purchases; however, that type of advance of credit in no way satisfies the requirement that 50 percent of the current market value of the security be *held* in a margin account. *See* 12 C.F.R. § 220.18. *See also* Letter from Laura Homer, Federal Reserve Board to Lawrence Iason, Securities and Exchange Commission (July 18, 1989), and I agree that reliance on the proceeds from the sale of a security as collateral is the same as reliance on the security itself.

22. The Agreement provides, *inter alia,* that:
   whenever [defendants] shall become or remain, directly or contingently, indebted or liable to the Bank in any manner whatsoever, the Bank shall then and thereafter have the following rights against the undersigned ...,

namely: 1. *All securities at any time deposited by the undersigned with the Bank as collateral to any such obligations or liabilities....* shall be subject to the terms of this agreement and held by the Bank as security for any obligations or liabilities ... of the undersigned to the Bank....

23. Regulation X removes from liability "[a]ny borrower who obtains purpose credit within the United States, *unless the borrower willfully causes the credit to be extended* in contravention of Regulations G, T, or U." 12 C.F.R. § 224.1(b)(1) (emphasis added).

24. The evidence reveals that the Bank was aware of defendants' financial scheme. Indeed, the Bank charged defendants' account substantial amounts of money for the overnight overdraft privileges. For example, the SEC has established that the Bank charged Graycliff $6,000 for overnight overdraft privileges in June, 1987. During that time, the Graycliff account had been in overdraft for 21 days, in amounts of up to $3,213,451.04.