

## NUMBER 13-13-00318-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

JUAN MEDINA,                                                                    Appellant,

v.

THE STATE OF TEXAS,                                                            Appellee.

### On appeal from the 117th District Court
### of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Benavides and Longoria
### Memorandum Opinion by Justice Benavides

By five issues, appellant Juan Medina challenges his conviction for aggravated

assault with a deadly weapon, a second-degree felony. *See* TEX. PENAL CODE §

22.02(2) (West, Westlaw through 2013 3d C.S.). Medina asserts that: (1) the

evidence is insufficient to sustain his conviction; (2) the trial court's comments, rulings,

and behavior at trial "vitiated" his presumption of innocence and violated his due process rights; (3) the trial court erred when it refused to accept the jury's "deadlock" vote during the guilt-innocence phase of the trial; (4) the trial court erred when it proceeded with eleven jurors without sufficient evidence that one of the jurors was disabled; and (5) he was denied effective assistance of counsel. We affirm.

## I. BACKGROUND

A Nueces County grand jury indicted Medina for an aggravated assault with a deadly weapon. *See id.* Medina pleaded not guilty and was tried before a jury. The record reveals the following:

On December 28, 2012, Corpus Christi police were dispatched to a home on the 1800 block of Talisman Street regarding a domestic disturbance in progress. Officer Reynaldo Tamez was the first to arrive on the scene and discovered a female running westbound down the sidewalk along Talisman Street. Officer Tamez testified that he made initial contact with the female, later identified as Christina Flores, who told him that Medina "tried to kill" her and "shot" at her. Officer Tamez described Flores's demeanor that night as "upset" and states that it appeared as if "she had been crying."

Flores testified that Medina is a family friend and that she has known him for "many years." On December 28, 2012, Medina invited Flores over to his home because Flores was interested in renting one of Medina's spare bedrooms. Flores testified that Medina drove them to his house on Talisman Street. When they arrived, Medina cooked food and drank beer. Flores then described what happened next:

> Yeah, I passed out for I don't even know how long, it probably wasn't even that long. I woke up and he was already—he was very intoxicated and he started calling me names and started pushing me around and all I know is I followed him to his room, he turned around and grabbed a gun from his

2

bed and that's when he shot. He shot at me and I turned around, I couldn't believe it and he was acting like it was nothing, like it was no harm done.[1]

Flores stated that after Medina fired the shot at her, he started "cussing" and "yelling" at her. At that point, Medina called her mother and her uncle "because [she] wanted to get out of [Medina's house]." Flores's uncle advised her to call the police. Flores testified that Medina did not want to let Flores out of his house and stood in front of the door, holding the gun. According to Flores, Medina eventually stopped blocking the door and that she was able to leave his home. At some point before leaving the house, Flores had fought Medina for his cell phone in order to dial 9-1-1. Flores was on the phone with the police department while she was inside of the house and after she left the house. Flores then testifies that she ran from Medina's home for about four or five house-lengths before she made contact with the police. On cross-examination, Flores could not recall how long she "passed out" at Medina's house, but explained that she fell asleep because she was tired from working "twelve hours a day" "seven days a week." Flores admitted that she had a criminal history including convictions for failure to identify, *see id.* § 38.02(b) (West, Westlaw through 2013 3d C.S.), and assault with family violence, *see id.* § 22.01(b) (West, Westlaw through 2013 3d C.S.). Additionally, Flores described Medina's gun as a "small" "revolver" gun with a "brown handle."

Corpus Christi Police Department Lieutenant William Broyles also testified. According to Lieutenant Broyles, he served as a hostage negotiator on the evening of December 28, 2012. Lieutenant Broyles stated that a hostage negotiator is an officer who has "specialized training in dealing with individuals that are going through a crisis." Lieutenant Broyles testified that he arrived at the scene on Talisman Street and gathered

---

[1] No evidence shows that Flores sustained any physical injuries from Medina's gunfire.

3

that no hostage situation was taking place. Lieutenant Broyles stated that he made contact with Flores at the scene, and she appeared "scared." According to Lieutenant Broyles, he could tell that Flores had been crying, and Flores told him that Medina shot at her. Lieutenant Broyles eventually obtained a search warrant of Medina's house and supervised its execution. Police found a revolver under Medina's mattress as well as some ammunition.

Jose Olivarez, another Corpus Christi police officer and hostage negotiator, testified that he observed Medina inside of the Talisman home that night through the window of Medina's rear sliding-glass door. According to Officer Olivarez, Medina "appeared . . . intoxicated," was "having a tough time standing up," and had a bottle of Budweiser beer in his left hand and a "dark-colored revolver" pointed down in right hand. Corpus Christi SWAT officers eventually entered Medina's residence with the assistance of specialized light and sound devices, or "flash bangs," to disorient Medina and allow the officers to enter the residence without incident. Medina was then arrested. Kara Schrader, a crime scene investigator for the Corpus Christi Police Department, also testified. Investigator Schrader photographed Medina's house, including the bedroom, and observed "three or four" bullet-sized holes in Medina's bedroom closet.

Edelia Medina, Medina's sister testified in her brother's defense. According to Edelia, her brother did not make the holes found in the closet. Edelia instead blamed the home's previous owner, who she knew. Edelia also possessed Medina's cell phone. The phone's call log showed that a call to "1-1-1" was made from the cell phone at 8:16 p.m. on December 28, 2012, and a call to 9-1-1 was made at 8:37 p.m. the same day. Medina did not testify.

4

The jury found Medina guilty as charged. Medina elected that the jury determine punishment. During the punishment phase of trial, Medina pleaded "true" to two prior felony convictions related to a 1986 burglary of a habitation charge and a 1998 felony driving while intoxicated offense. Under the habitual felony offender statute, *see id.* § 12.42(d) (West, Westlaw through 2013 3d C.S.), Medina faced a minimum term of sentence of twenty-five years. The jury sentenced Medina to twenty-five years' imprisonment with the Texas Department of Criminal Justice—Institutional Division and assessed a $5,000 fine. This appeal followed.

## II.  SUFFICIENCY CHALLENGE

By his first issue, Medina asserts that the evidence is insufficient to support his conviction for aggravated assault with a deadly weapon.[2]

### A.  Standard of Review and Applicable Law

In reviewing sufficiency of evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). In viewing the

---

[2] We note that Medina challenges the factual and legal sufficiency of the evidence supporting his conviction. The Texas Court of Criminal Appeals has held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902–03, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Accordingly, we will review Medina's claims of evidentiary sufficiency under a "rigorous and proper application" of the *Jackson* standard of review as legal sufficiency issues. *Id.* at 906–07, 912.

evidence in the light most favorable to the verdict, we defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Brooks*, 323 S.W.3d at 899. It is unnecessary for every fact to point directly and independently to the guilt of the accused; it is enough if the finding of guilty is warranted by the cumulative force of all incriminating evidence. *Winfrey*, 393 S.W.3d at 768 (citations omitted).

The elements of the offense are measured as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

Under a hypothetically correct jury charge, as authorized by the indictment, Medina is guilty of aggravated assault if he: (1) intentionally or knowingly threatened Flores with imminent bodily injury; and (2) used or exhibited a deadly weapon during the commission of the assault. *See* TEX. PENAL CODE ANN. §§ 22.01–.02 (West, Westlaw through 2013 3d C.S.). "The gist of the offense of assault . . . is that one acts with intent to cause a reasonable apprehension of imminent bodily injury." *Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. 1981). A threat may be communicated by the action or conduct as well as words of the perpetrator. *McGowan v. State*, 664 S.W.2d 355, 357 (Tex. Crim. App. 1984). Lastly, a firearm is considered a "deadly weapon." *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (West, Westlaw through 2013 3d C.S.).

6

**B. Discussion**

Medina asserts that the evidence is insufficient to support a finding that Medina committed aggravated assault with a deadly weapon against Flores. We disagree. The evidence shows that Flores and Medina were together on December 28, 2012 at Medina's house. After Flores fell asleep at Medina's house, Flores and Medina entered into an argument inside of Medina's bedroom. Flores testified that Medina then pulled out a gun and fired it in Flores's direction, but did not strike her.

Officer Tamez testified that he made initial contact with Flores and observed Flores running from Medina's home. It appeared as if she was "upset" and "had been crying." Lieutenant Broyles, who also spoke to Flores that night described her as "scared" and also observed that she appeared to be crying. Officer Tamez and Lieutenant Broyles each testified that Flores told him that Medina shot at her. Crime scene investigator Schrader testified that during her investigation of the scene, she observed "three or four" holes in the bedroom closet of the bedroom in which Medina allegedly fired his gun. Furthermore, Officer Olivarez observed Medina inside of his house, following the shooting, with a bottle of beer in one hand and a "dark colored revolver" in the other hand. This evidence would allow a rational fact finder to conclude that Medina fired his revolver at Flores to cause her a reasonable apprehension of imminent bodily harm, as evidenced by Flores running out of Medina's home in fear for her life. Finally, we are unpersuaded by Medina's arguments attacking Flores's credibility about the events that had transpired. The jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony; therefore, we decline to second-guess those jury determinations on appeal. *See Brooks*, 323 S.W.3d at 899.

Therefore, after considering all of the evidence in the light most favorable to the verdict, we conclude that a rational fact finder could have found Medina guilty of aggravated assault with a deadly weapon beyond a reasonable doubt. Medina's first issue is overruled.

### III.   DUE PROCESS VIOLATIONS

By his second issue, Medina asserts that the trial court's bias, evidenced by "comments, rulings, and behavior[,] vitiated" his presumption of innocence in violation of his due process rights.

### A.  Applicable Law and Standard of Review

"Due process requires a neutral and detached hearing body or officer." *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpeli*, 441 U.S. 778, 786 (1973)). This requirement also ensures that a party have a "fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (citing *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). Due process also does not permit a judge to assume the role of a prosecutor. *Avilez v. State*, 333 S.W.3d 661, 673 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). However, not every complaint about a judge or the conduct of the trial implicates constitutional due process protections, *see id.*, and "most matters relating to a judicial disqualification [do] not rise to a constitutional level." *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009).

Absent a clear showing of bias, a trial court's actions will be presumed to have been correct. *Brumit*, 206 S.W.3d at 645 (citing *Thompson v. State*, 641 S.W.2d 920, 921 (Tex. Crim. App. 1982)).

**B. Discussion**

Medina cites to various incidents during the proceedings below that show that the trial court was “not impartial” and “motivated by bias.” First, Medina argues that at the close of voir dire before the venire panel, the trial court made the following remark to Medina’s trial counsel: “You know the problem I’m having, I look at you but I hear your father speaking.” Medina’s trial counsel did not object to the trial court’s statement, but counsel also mentioned his father while questioning a prospective juror during individual voir dire. Counsel remarked to a prospective juror, who counsel had met prior to trial through her husband, that the prospective juror’s husband, who is also an attorney, was friends with counsel’s father who “has been a lawyer and a [j]udge in [Corpus Christi] for many many years. . . .” We conclude that this comment by the trial court, when put into context, does not show clear bias to deny Medina due process.

Next, Medina complains about the following exchange that took place in an evidentiary hearing outside of the presence of the jury over the admissibility of a 9-1-1 call recording:

| | |
|---|---|
| Q. (By Defense Counsel): | Is that the full conversation, is that the full 911 -- I can't even speak. Both of those calls, are those the full transcripts -- the full recordings of all the conversations? |
| A. (By Witness): | As far as I was involved, yes, sir. |
| The Court: | You told me that you had heard it already and you don't know the victim. We're going through this even after you said you had heard it. I suggested we do so another time and not waste the jury's time but you had told me you heard it all and you're not sure that it's the full one? |
| [Defense Counsel]: | It's -- |

| | |
|---|---|
| The Court: | Well, you just asked her is that the full conversation between you and the -- |
| [Defense Counsel]: | That's correct. |
| The Court: | And the 911 caller. |
| [Defense Counsel]: | What I told you is that I listened to what the DA gave me and that's -- I don't know the -- |
| The Court: | Is that different from what the DA gave you? |
| [Defense Counsel]: | No, sir. That is the same thing but it's my job to establish a record where this witness here testifies -- |
| The Court: | Yeah, but why don't we do it in front of the jury? See, right now -- |
| [Defense Counsel]: | Because she couldn't testify to it in front of the jury. |
| The Court: | Why not? |
| [Defense Counsel]: | I don't know, ask her why she couldn't testify to it. |
| The Court: | No, she said she didn't remember. That's the deal I got. You keep telling me they gave me a copy and then you still ask her is that the full deal. |
| [Defense Counsel]: | Because I have to make a record, Your Honor. For the record, Your Honor, may I approach? Your Honor, I want to make a record of this: I think it's highly inappropriate for you to question my ethics here and I'm moving for recusal at this point. I think it's highly inappropriate to question my ethics when I'm over here asking the witnesses proper questions -- |
| The Court: | Your motion for recuse is denied. My problem with you -- |
| [Defense Counsel]: | You're yelling at me, Your Honor. I would like |

10

the record to reflect that there's a tone where I have the Court yelling at me for --

The Court: This is yelling. What I was telling you is not yelling.

[Defense Counsel]: Well, the record will reflect that that was yelling.

The Court: The last one was because I wanted to show you the difference between yelling or not. My voice is strong. I told the jury I don't need a microphone because my voice projects very far but I'm not yelling at you. I wasn't yelling at you. I showed you what the difference between yelling and not yelling is for my voice. Now you know the difference. I'm not yelling at you. I'm concerned about all the delays that we're experiencing, [defense counsel].

[Defense Counsel]: I feel like the Court is improperly chastising me for asking the witness an appropriate question with regard to whether or not that's the full transcript.

The Court: Well, the problem that I'm having, [defense counsel], is because I asked you at least once or twice did you get a copy of the transcript? Yes. Did you listen to it? Yes. And then you just listened to it. I've never listened to it until right now and yet you don't know if that's all of it and you've got a copy of it before.

[Defense Counsel]: Do you understand the objection I'm making, Your Honor?

The Court: No, I don't, that's the problem I'm having.

[Defense Counsel]: There's a distinction between what the prosecutor gave me and what she -- there could be a possible distinction between what the prosecutor gave me and a full transcript. I don't know if -- I think the prosecutor would be ethical but I don't know for sure. I have to confirm that [with] what the prosecutor gave me—

11

The Court: That's why I asked you, is that the same thing you heard and you said yes. Now, you questioned the very first one you got, not this one. You questioned the first one you got.

[Defense Counsel]: The CD I received from the State, Your Honor, is the CD that includes not just 911 calls but also radio transmissions.

The Court: I understand that.

. . . .

(Members of the jury enter courtroom)

The Court: You ever seen the catcher approach the pitcher and they talk sometimes and nobody else can hear?

Well, that's the purpose of this so I can make rulings without you knowing and then if I go one way, if you hear it, if I go the other way you don't hear it. So, thank you for your patience. Let's continue, please.

. . . .

If you heard any yelling it was demonstrations I was making. It had nothing to do with the issue, okay? It was something else. I was just making jokes and stuff. All right.

Medina contends that this exchange evidences that "the whole tone of the [trial] court towards his defense counsel . . . was on[e] of derision and contempt." We disagree. The colloquy reveals that the trial court was confused about Medina's trial counsel's objection in a hearing outside of the presence of the jury. When asked whether the trial court understood defense counsel's objection, the trial court admitted that it did not understand the objection, and sought a clarification. Furthermore, while the trial court appeared to raise its voice at one point during the hearing, it appeared to be a

12

demonstrative response to Medina's trial counsel's argument that the trial court had been "yelling." Additionally, when the jury returned to the courtroom, the trial court clarified for the jury that any yelling that they may have heard outside of their presence was purely demonstrative.

Next, Medina complains that the trial court "fraternized" with a prosecutor from the district attorney's office, Retha Cable, by going to lunch with her on the first day of trial. This complaint was brought to the trial court's attention in a motion for mistrial during the punishment stage of the trial. Medina's counsel made the following objection, in relevant part:

| [Defense Counsel]: | [. . . . ] [I]t is my understanding on Thursday, May 9th that the Court had lunch with Retha Cable and Retha Cable was a prosecutor who was making objections from the gallery and then she made an appearance in front of the bench. |
|---|---|
| The Court: | The record should show that the jury was not present. If you're objecting to there being another attorney— |
| [Defense Counsel]: | This is a separate matter. It's my understanding that the Court had lunch with her during the course of the proceedings and she is an attorney who made an appearance in this case and I actually heard rumors that the Court had discussed—rumors—that the Court had discussed counsel's conduct during trial. I asked [the prosecutor] to investigate those rumors. She's an officer of the court, she has told me that she has talked to Ms. Cable and Ms. Cable as an officer of the court has denied those rumors that there was no discussion of my conduct at the lunch with you but I just want to make a record that I've relied on opposing counsel's word as an officer of the court that that's actually what happened so, I don't see any problem there if there's been no discussion |

13

of my conduct at lunch with the state attorney.

However, with all the other issues in this trial, where I don't think the record reflects a tone on movement for mistrial on both guilt and innocence based on the 6th amendment violation.

The Court: Okay. [defense counsel], I think that the record should reflect that Retha Cable—when I retired in the year 2000— was my prosecutor. She was my prosecutor about a year or so. I— Retha Cable was later—took a job with San Patricio County I guess, it's a two or three county district and I don't get to see Retha Cable that often and we made plans. When I found out that she was back in Nueces County to have lunch and it's got nothing to do with the lawsuit. Retha Cable was in the audience here so we can go to lunch and we were involved in a discussion—I forget what the matter was and you made a comment that Retha Cable was not part of the involvement in this lawsuit. We were talking about an issue and I think she made a comment that she was asked by the prosecutor to help out on that issue and I know Retha Cable has a lot of experience so we were not in front of the jury so I had no problem with that and that was the extent of it.

You're asking me to recuse myself the way I interpret the law is it's up to me. There's no automatic of recusal in criminal cases. If you ask me to recuse, I make a decision whether or not to recuse myself or not. I didn't think there was enough for me to recuse but you should know, [defense counsel] that you have another remedy. You can ask that I be disqualified and that's a different issue. I haven't seen any motion yet to disqualify me, okay? I don't know why. I assume that you know that there is a way if you feel that I'm prejudiced of this case.

I feel [defense counsel], that your attempts to get me off of the case is because you don't like my rulings and I've told you several times

14

there's a Court of Appeals. If you do not like my rulings, there's a Court of Appeals you could appeal to. Just because you don't like the rulings of the Court doesn't mean that the Court should recuse themselves, it doesn't work that way, okay? Again, there's a record made of everything that happened during the trial. Bring it up to the attention of the Court of Appeals and they'll rule on it but that's fine.

. . . .

[Defense Counsel]:        Motion is denied?

The Court:        Denied, of course. . . .

Medina's counsel's specific objection to the Cable lunch was based upon rumors that the trial court and Cable spoke about his conduct during trial. Medina's counsel stated that the prosecutor who tried the instant case investigated the rumors, at counsel's request, and found them to be meritless. Furthermore, the trial court stated on the record that any discussions with Cable at lunch did not involve the defense counsel's conduct during trial. As such, we conclude that this does not indicate any clear indication of bias to establish that Medina's due process rights were violated. *See Brumit*, 206 S.W.3d at 645.

Finally, Medina asserts that the trial court further showed bias by overruling his counsel's objection on constitutional grounds to the taking of his fingerprints during the second day of the guilt-innocence portion of the trial. Again, we disagree. The State articulated on the record that the taking Medina's fingerprints during trial was to identify him to prior crimes solely for purposes of punishment. "The taking of fingerprints at the time of or during trial for comparison purposes" is proper and does not violate the defendant's Fifth Amendment rights. *Hendrix v. State*, 474 S.W.2d 230, 233 (Tex.

15

Crim. App. 1971); *see also* 43A GEORGE E. DIX & JOHN M SCHMOLESKY, CRIMINAL PRACTICE & PROCEDURE, § 46:108 (3d ed. 2011) ("By far, the most common method of proving [identity] is by fingerprint comparison. This method usually entails taking the fingerprints of the defendant during the trial.").

Accordingly, after examining each of Medina's arguments, we conclude that the record does not reveal a clear bias by the trial court to show that Medina's due process rights were violated. Medina's second issue is overruled.

## IV.   DEADLOCKED JURY

By his third issue, Medina asserts that the trial court committed reversible error when it refused to accept the jury's deadlock vote during the guilt-innocence phase of his trial.

### A. Applicable Law and Standard of Review

The relevant statute of the code of criminal procedure states the following:

> After the cause is submitted to the jury, it may be discharged when it cannot agree and both parties consent to its discharge; or the court may in its discretion discharge it where it has been kept together for such time as to render it altogether improbable that it can agree.

"The decision of whether to require a jury to continue deliberating lies within the discretion of the court." *Johnson v. State*, 137 S.W.3d 777, 779 (Tex. App.—Waco 2004, pet. ref'd) (citing *Guidry v. State*, 9 S.W.3d 133, 155 (Tex. Crim. App. 1999)). Reversal is mandated only if the record reveals that the trial court abused its discretion in holding the jury for deliberations. *Jackson v. State*, 17 S.W.3d 664, 678 (Tex. Crim. App. 2000). There are no time limits on the amount of time a jury may deliberate. *Guidry*, 9 S.W.3d at 155. To determine whether the trial court abused its discretion in ordering a jury to continue deliberations, we considered several factors including:   the

16

length of the trial, the amount of evidence admitted, and the nature and complexities of the case. *Johnson*, 137 S.W.3d at 779.

**B. Discussion**

The jury retired to deliberate the guilt-innocence phase of Medina's trial on Friday, May 10, 2013 at 3:55 p.m. At 5:31 p.m., the jury sent the following note: "We have a jury ten to two. The folks do not believe they can change their minds without additional evidence." The trial court then summoned the jury into the courtroom and stated the following:

> Members of the jury, remember I told you I don't like that word "if" because my job is to come up with a verdict. It doesn't matter which way you go. I have no—it doesn't matter to me if you find him guilty or not guilty but I have to have a verdict. The law in Texas, at lease [sic], does not provide that I submit more evidence to you after both sides have closed. Once the case goes to you, that's it, no more.
>
> When something like this happens it's my job to convince you to continue to deliberate. We have what is called the dynamite charge and I'll tell you why it is important that you come up with it. The same time you spent another jury will spend the same time trying the same issues that you're trying.
>
> I don't present evidence to you, the attorneys present evidence to you. I only —with the evidence—decide which one goes to you and which doesn't but I don't present evidence. I don't know where you have the problem, what part of the evidence, but I gather that you're saying that you don't have enough evidence.
>
> The reason we have a different face from the court reporter is because the court reporter -- it was her graduation night and I did not want her to miss it. In fact, she is going to be walking right now in the graduation. The problem I am going to have if we continue is I don't know if this court reporter can read the notes of the other court reporter if you ask me anything.
>
> So I am inclined to recess and let you think about it personally but you can't—if I recess—now, I'll continue here if that's what you want to do. Don't take me wrong, we'll stay here. I will have a problem if you ask me a question that this court reporter may not be able to read. They have a language, it's mostly their own and I can't promise you if what court

reporter can read the other court reporter's language. It has been known that some of them can, okay but that's the problem that I have. So I don't know if you want to continue.

I can't ask which way are you are going—I'm sorry, who's the—I keep looking at you. We couldn't tell the way you sign is kind of the way I sign. I kept looking to this lady right here so I could see all of you with my peripheral vision. So, it's Friday, if you want to stay I will stay with you until sunrise, okay? But if you ask me to repeat—to read back to you something in the record, my problem is if Myra cannot read it then I won't be able to do it. So I am suggesting if you want to continue or after I talk to you right now and you go back and resolve your problem, I am fine with that because I don't know which way you are leaning. I am not—nobody is . . . allowed to ask you. So it could be one way—I mean, it has to be one way or the other. Could be for one side or the other so I am suggesting we do it that way but if you want to continue, let me know. I am going to have the dynamite charge if I can find one prepared while you are back there if you want to stay and then I am going to bring you back in at one point where you tell me again and I am going to ask everybody individually if I—we can continue to deliberate, do you think you can come to a unanimous verdict but I personally don't think that some of you are at that point yet. So why don't you go back into the jury room, tell me if you want to recess after I've told you these things and if you don't I promise you we'll stay here with you as long as you want, okay?

I have to know because I need to prepare things like get you something to eat, that type of thing. I am not going to call hotels, I am not. I've never sequestered a jury but it might turn out to be that. One of the [attorneys] has to ask me to sequester you. That's the only way I would sequester you. So, if it gets to that point, I am going to have somebody start calling hotels, stuff like that.

I think the best way to do it is to go home, enjoy the weekend, come back, look at it again and you might have an answer but that's me. I am not telling you what to do, okay? Don't feel like the Judge said we had to go home. I am leaving that up to you. That's why I sent you that note. I do whatever the jury wants, okay? Go in there and send me a note and tell me what you want to do.

(Members of the jury exit courtroom)

At 5:40 p.m., the jury sent the trial court a note indicating that they wanted to recess for the weekend. The trial court obliged with the request and recessed the proceedings until Monday, May 13, 2013. At 9:45 a.m. on May 13, the jurors resumed deliberations.

18

At 10:54 a.m., the jury returned a unanimous verdict of guilty.

Medina argues that the trial court abused its discretion by recessing the proceedings and coercing the jurors to reach a verdict "by his words, by talking about a dynamite charge, [and] talking about sequestration. . . ." We are unpersuaded by this argument.

Medina was on trial for a second-degree felony aggravated assault. The jury deliberated approximately an hour and a half before indicating to the trial court that they were deadlocked. The guilt-innocence portion of Medina's trial lasted approximately three days with nine witnesses testifying and approximately one hundred and twenty-two exhibits that were mostly photographs of the scene. Furthermore, the trial court stated on the record that another court reporter was substituting for the trial court reporter during the jury's deliberations due to a prior engagement by the trial court reporter. The trial court additionally explained that the substitution could cause transcription difficulties, if a transcript was needed. Finally, the trial court told the jury that it was willing to stay with the jurors "until sunrise," but it would leave the decision to continue deliberations until Monday, May 13, 2013 with the jury. Ultimately, the jury requested a recess for the weekend, and the trial court granted the request. After reviewing this record with the *Johnson* factors, *see* 137 S.W.3d at 779, as well as with the particular circumstances of this case, we cannot conclude that the trial court abused its discretion in recessing the jury's deliberations for the weekend. Medina's third issue is overruled.

## V. DISABLED JUROR

By his fourth issue, Medina asserts that the trial court erred by proceeding to punishment with eleven jurors without sufficient evidence that the juror was disabled.

19

## A. Applicable Law and Standard of Review

> Not less than twelve jurors can render and return a verdict in a felony case. It must be concurred in by each juror and signed by the foreman. Except as provided in Subsection (b), however, after the trial of any felony case begins and a juror dies or, as determined by the judge, becomes disabled from sitting at any time before the charge of the court is read to the jury, the remainder of the jury shall have the power to render the verdict; but when the verdict shall be rendered by less than the whole number, it shall be signed by every member of the jury concurring in it.

TEX. CODE CRIM. PROC. ANN. art. 36.29 (West, Westlaw through 2013 3d C.S.). The trial court has discretion to determine whether a juror has become disabled. *See Scales v. State*, 380 S.W.3d 780, 783 (Tex. Crim. App. 2012). Article 36.29 requires that a disabled juror suffer from a "physical illness, mental condition, or emotional state that would hinder or inhibit the juror from performing his or her duties as a juror, or that the juror was suffering from a condition that inhibited him from fully and fairly performing the functions of a juror." *Id.* (internal quotations omitted). When dismissing a juror, the trial court must not dismiss a juror for reasons related to that juror's evaluation of the evidence. *Id.* The trial court is the sole fact-finder and judge of the credibility of testimony, and its decision under article 36.29 is reviewed for an abuse of discretion. *Id.* at 784. Absent such an abuse, we will not find reversible error. *Id.* Under our review of whether the trial court's ruling was arbitrary or unreasonable, we cannot presume from a silent record that a dismissal of a juror was proper; however, we will not substitute our own judgment for that of the trial court. *Id.* Rather, we will uphold a trial court's ruling if it is within the zone of reasonable disagreement. *Id.*

## B. Discussion

Medina argues that there was insufficient evidence for the trial court to conclude that the juror suffered from a disability pursuant to article 36.29. We disagree. The following relevant exchange took place during the punishment phase of Medina's trial:

| | |
|---|---|
| The Court: | [. . . .] Let the record reflect that yesterday, May the 13th of 2013, both sides of this lawsuit on the punishment phase rested and closed. I asked the jury to return back this morning at nine o'clock. When I got here, I was given a note from one of my jurors, Elgin Williams, I believe he's the foreman. Identify yourself for the record, please. |
| [Witness]: | Javier Carrizales. |
| The Court: | And you're the court interpreter? |
| [Witness]: | Yes, I am, Your Honor. |
| The Court: | And you work with the court administrators? |
| [Witness]: | I do. |
| The Court: | So, if somebody wants to reach the court, they usually call your office? |
| [Witness]: | Correct. |
| The Court: | And I was given a note that – did you take the note from that juror? |
| [Witness]: | Yes, I did. |
| The Court: | Would you tell the attorneys and the Court and the record what transpired in the conversation between you and the juror. |
| [Witness]: | Mr. Elgin called and advised that he wouldn't be able to make it in today because he was very ill and he couldn't get out of bed, please let the judge know. |
| The Court: | All right, that's your entire conversation? |
| [Witness]: | That's the entire conversation. |

The trial court implicitly found Carrizales's testimony credible and concluded that Juror Elgin suffered from an illness that inhibited his ability to serve as a juror. Furthermore, we note that the option to proceed with eleven jurors was agreed to by the parties. The following colloquy took place, after Medina was individually asked whether he consented to proceeding with eleven jurors:[3]

[Medina]:     Let's continue.

The Court:     You want to go with 11?

[Medina]:     Yes, sir.

We conclude that the trial court's ruling was neither arbitrary nor unreasonable and within the zone of reasonable disagreement. *See id.* However, even assuming without deciding that the trial court abused its discretion, Medina agreed to proceed with eleven jurors, which waives any complaint he makes now on appeal. *See Hatch v. State*, 985 S.W.2d 813, 816 (Tex. Crim. App. 1997) (en banc) ("A defendant who agrees to be tried by less than twelve jurors is still exercising his right to trial by jury."). Therefore, Medina's fourth issue is overruled.

## VI.     INEFFECTIVE ASSISTANCE OF COUNSEL

By his final issue, Medina argues that he was denied effective assistance of counsel.

### A. Standard of Review and Applicable Law

To prevail on a claim of ineffective assistance of counsel the defendant must meet the heavy burden of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the defendant must show by preponderance of evidence that: (1) counsel's

---

[3] The State did not object at trial, nor does it argue on appeal that it opposed proceeding with eleven jurors.

representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that the result of the proceeding would have been different but for the attorney's deficient performance. *Id.* at 687; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.). Allegations of ineffectiveness must be "firmly founded in the record." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Direct appeal is usually inadequate to make an ineffectiveness claim because the record is often undeveloped. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). We look to "the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel." *Thompson*, 9 S.W.3d at 813. If an appellant fails to prove one prong of the test, we need not reach the other prong. *See Strickland*, 466 U.S. at 697; *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

### B. Discussion

Medina makes three arguments in support of his claim of ineffective assistance of counsel: (1) his trial counsel failed to call him as a witness; (2) his trial counsel failed to move for a mistrial during the jury's "deadlock" note to the trial court, as well as during the disabled juror hearing; and (3) his trial counsel failed to seek out and interview potential witnesses regarding the December 28, 2012 incident.

In evaluating the first prong of *Strickland*, counsel's competence is presumed and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). The reasonableness of counsel's performance is to be evaluated from counsel's perspective

at the time of the alleged error and in light of all the circumstances. *Id.* Medina's brief does not explain why his trial counsel's alleged failures were "unreasonable under prevailing professional norms" nor does his brief explain how or why such complained action was not sound trial strategy. *See id.* Accordingly, we conclude that Medina did not rebut his trial counsel's presumption of competence.[4] Medina's fifth issue is overruled.

## VIII. CONCLUSION

We affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
14th day of August, 2014.

---

[4] Medina asserts in his brief that his trial counsel "raised the issue of ineffective assistance . . . against his own self interest" during the hearing on the disabled juror. We do not agree with Medina's interpretation of the record. During the disabled juror hearing, Medina's counsel moved for a mistrial on the grounds that the trial court "[struck] at [Medina] over the shoulders of his counsel" in violation of Medina's Sixth Amendment right to counsel. Medina's counsel's motion for mistrial related to the issue addressed in Part III of this opinion, not the issue of ineffective assistance of counsel now asserted on appeal.

24